GILMAN, J., delivered the opinion of the court in which SUTTON, J., joined. CLAY, J. (pp. 568-78), delivered a separate dissenting opinion.
OPINION
RONALD LEE GILMAN, Circuit Judge.
Like many American cities, the City of Howell, Michigan requires its property owners to keep their lawns mowed below a certain height. Violators of the ordinance are charged a fine as well as a fee for the costs associated with hiring a private contractor to mow or otherwise maintain the property. David Shoemaker, then a homeowner in the City, refused to mow the area between the sidewalk and the street (the curb strip) in front of his house after the City had relandscaped the curb' strip against his wishes. After multiple warnings, the City hired a local contractor to mow Shoemaker’s curb strip on two separate occasions and charged him a total of $600.
Shoemaker subsequently filed suit against the City in federal court, asserting violations of both his procedural and substantive due process rights. The district court granted summary judgment for Shoemaker on both claims. For the reasons set forth below, we REVERSE the judgment of the district court and REMAND the case with instructions to dismiss Shoemaker’s complaint.
I. BACKGROUND
A. Factual background
In 2003, Shoemaker purchased a house located on the corner of South Elm and East Sibley Streets in the City. He lived in that house with his minor daughter until he sold the property in 2012. During this time, the City undertook a citywide project to refurbish and landscape its streets. This project involved gutter replacement, road repairs, and a widening of the curb strips. The portion of East Sibley Street adjacent to the Shoemaker residence was among the areas impacted by the City’s efforts. As part of the project, the .City removed a tree planted in the curb strip by Shoemaker and replaced it with nine saplings. Shoemaker claims that when he protested the tree’s removal, City workers told him “that’s not your property, you have no say on what goes in or out of there.” Upset by the City’s unilateral remodeling of the curb strip, Shoemaker chose to protest the City’s actions via civil disobedience: he stopped mowing the curb strip.
On August 17, 2010, the City received a complaint about Shoemaker’s lawn. The complaint, which was emailed to Code Enforcement Officer John Donahue, claimed that “My neighbors have not mowed their *557 lawn in weeks — this has happened 4 times already this year. There is going to be a rodent problem shortly if there is nothing done about this.” Based on this complaint, Donahue visited the residence and left a door-hanger notice informing Shoemaker that his lawn was in violation of City Code § 622.02 (the Ordinance), which sets forth the duty of property owners and occupants to maintain the vegetation on their land. When Donahue returned to the residence several days later, the lawn and curb strip had been mowed and brought into compliance with the Ordinance.
The Ordinance, first adopted in 1959, prohibits the owner or occupant of any lot in the City from “maintain[ing] on any such lot ... any growth of weeds, grass or other rank vegetation to a greater height than eight inches.” City Code § 622.02(a). It explicitly applies to any land “along the sidewalk, street or alley adjacent to the same between the property line and the curb.” A violation of the Ordinance constitutes a municipal civil infraction, which subjects the responsible party to the civil fines set forth in City Code § 202.99. See City Code § 622.99. Anyone accused of such an infraction is notified by either a “citation,” City Code § 208.02(e), or a “violation notice,” City Code § 208.02(f).
Donahue next became aware of tall vegetation on the Shoemaker property the following spring. He mailed Shoemaker a “Notice of Ordinance Violation” letter on May 17, 2011, advising Shoemaker of (a) the alleged violation of the Ordinance, (b) the substance of the Ordinance, (c) the time allowed to remedy the violation (five days), and (d) the various fees associated with noncompliance. That same day, Donahue also left a door-hanger notice at Shoemaker’s residence advising him of the violation. Donahue returned a week later to find the grass adequately trimmed.
Shoemaker apparently kept his lawn and the adjacent curb strip in compliance with the Ordinance for several months following the May 2011 violation. On August 4, 2011, however, Donahue again noticed vegetation that was taller than eight inches on the curb strip in front of Shoemaker’s house. As before, Donahue left a door-hanger notice informing Shoemaker of the violation and mailed another Notice of Ordinance Violation on August 9. Donahue returned to the property on August 10 to find that, although the lawn had been freshly mowed, the grass on the curb strip remained in excess of the Ordinance’s limitation. When Donahue returned again to inspect the property on both August 16 and 17, the curb strip’s vegetation remained uncut.
Donahue then contacted Shaner’s Cutting Edge, a local landscaping contractor, on August 17, 2011 and asked the contractor to mow the curb strip in front of Shoemaker’s house later that day. Despite Donahue’s work order, the contractor had not mowed the area when Donahue returned on August 18. This time Donahue took pictures of the curb strip to document the violation, and he spoke with Shoemaker’s daughter about the issue. During the conversation, Donahue gave Shoemaker’s daughter another door-hanger notice, this one marked “FINAL NOTICE!”
When Shoemaker learned of Donahue’s conversation with his daughter, Shoemaker contacted City Hall to complain about the interaction, which his daughter described as “nerve [wjracking.” Donahue later called Shoemaker to “apologize if he intimidated [Shoemaker’s] daughter,” and the two men discussed the overgrown grass. During that call, Shoemaker insisted that he would not mow the curb strip because he had been told by City employees that the area was the City’s property and not his own. According to Shoemaker, Donahue insisted that the property did in fact belong to Shoemaker. The call *558 ended with Shoemaker indicating that he wanted to be ticketed for the violation in order to challenge the Ordinance in court. This was the only conversation that ever took place between Shoemaker and Donahue.
Shaner’s Cutting Edge finally mowed the curb strip sometime between August 23 and 25, 2011. The City later charged Shoemaker $150 for the contractor’s services associated with mowing the curb strip.
Six weeks later, on October 11, 2011, Donahue again found Shoemaker’s curb strip in violation of the Ordinance. As before, he left a door-hanger notice informing Shoemaker of the violation and mailed a Notice of Ordinance Violation the following day. This was the fourth door-hanger notice and the third notification letter that Donahue had addressed to Shoemaker regarding the vegetation issue. Shoemaker again failed to bring the curb strip into compliance, and Donahue once more hired Shaner’s Cutting Edge to mow the area, which the company did sometime between November 1 and 4, 2011. The City charged Shoemaker another $150 for the contractor’s services.
Both parties agree that Shoemaker was charged a total of $600 for his violations of the Ordinance. He paid that amount as part of the property taxes due upon selling the house in late 2012. Although the record does not appear to contain an itemized bill, the $600 total apparently includes $300 in fees ($150 for each grass-cutting service) and $300 in fines ($50 for the first infraction and $250 for the second). These charges are consistent with the fee/fine schedule laid out in each of the Notice of Ordinance Violation letters sent by Donahue to Shoemaker.
B. Procedural background
Shoemaker filed suit against the City and Shaner’s Cutting Edge in federal court in November 2011, asserting violations of his procedural due process, substantive due process, equal protection, and Fourth Amendment rights. The parties later stipulated to the dismissal of (a) Shaner’s Cutting Edge, and (b) the claims based on equal protection and the Fourth Amendment. Shoemaker and the City then filed cross-motions for summary judgment on the remaining procedural and substantive due process claims. After a hearing on those motions, the district court granted summary judgment in favor of Shoemaker on both counts. This timely appeal followed.
II. DISCUSSION
A. Standard of review
We review de novo a district court’s grant of summary judgment. Keith v. Cnty. of Oakland, 703 F.3d 918, 923 (6th Cir.2013). Summary judgment is proper when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In considering a motion for summary judgment, all reasonable inferences arising from the undisputed facts must be drawn in favor of the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).
Shoemaker challenges the constitutionality of the Ordinance on both procedural and substantive due process grounds. We will address each challenge in turn.
B. The City did not violate Shoemaker’s procedural due process rights because it provided him with ample notice of the violation and an adequate opportunity to be heard

1. Legal standard

In considering procedural due process claims, we must first determine *559 whether the alleged deprivation is within the ambit of the Fourteenth Amendment’s protection of liberty and property. Hahn v. Star Bank, 190 F.3d 708, 716 (6th Cir.1999). This analysis is simple here because the City acknowledges that Shoemaker had a protected property interest in the $600 that the City charged him for violations of the Ordinance.
We must next determine whether the City afforded adequate process prior to and following the deprivation. At its essence, due process can be summarized as “the requirement that a person ... be given notice of the case against him and [an] opportunity to meet it.” Mathews v. Eldridge, 424 U.S. 319, 348-49, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quoting Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 171-172, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring)) (internal quotation marks and alteration omitted).
We weigh several factors in deciding exactly how much process is due:
[1] the private interest that will be affected by the official action; [2] the risk of an erroneous deprivation[;] ... [3] the probable value, if any, of additional or substitute procedural safeguards; and [4] the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Id. at 335, 96 S.Ct. 893 (citing Goldberg v. Kelly, 397 U.S. 254, 263-271, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)). As the multi-factored test from Mathews suggests, the requirements of due process are fluid and fact dependent. Id. at 334, 96 S.Ct. 893 (citing Cafeteria Workers v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961)). Furthermore, pre- and post-deprivation processes should be considered together as a single package:
The predeprivation process need not always be elaborate, however; the amount of process required depends, in part, on the importance of the interests at stake.... Moreover, the sufficiency of predeprivation procedures must be considered in conjunction with the options for postdeprivation review; if elaborate procedures for postdeprivation review are in place, less elaborate predeprivation process may be required. In some cases, postdeprivation review may possibly be sufficient, and no predeprivation process is required.
Leary v. Daeschner, 228 F.3d 729, 742-43 (6th Cir.2000) (citations omitted); see also Mathews, 424 U.S. at 349, 96 S.Ct. 893 (finding that “an evidentiary hearing is not required prior to the termination of disability benefits”); see also Spinelli v. City of New York, 579 F.3d 160, 171 (2d Cir.2009) (“Under the circumstances, ... the City was not required to provide Spinelli with pre-deprivation due process before suspending her license and seizing her firearms.”).
The district court found that the City “fail[ed] to provide any legitimate protection of Plaintiffs property interest” because “[t]he Ordinance is devoid of any mechanism by which a citizen may invoke to seek a hearing before a court or a quasi-judicial board on any issue.” In short, the district court held that “the City failed to provide Plaintiff with a meaningful prede-privation or postdeprivation hearing as required under the 14th Amendment.” We respectfully disagree with the district court’s conclusion for the reasons set forth below.

2. The City provided Shoemaker with multiple notifications of the Ordinance violation in question

The record clearly establishes that the City provided Shoemaker with ample no *560 tice of the allegations against him. Over the course of 16 months, Donahue warned Shoemaker that he was in violation of the Ordinance on at least six separate occasions. These warnings included four door-hanger notices, three Notification of Ordinance Violation letters, a conversation with Shoemaker’s daughter, and a telephone conversation between Donahue and Shoemaker himself. Shoemaker admits that he knew of the charges levied by the City, but he argues that the City failed to notify him about the ways in which he could challenge those charges.
At oral argument, the City conceded that the Notices of Ordinance Violation issued to Shoemaker do not fully comport with the requirements laid out in the City Code. Section 208.07(e) of the City Code mandates that any violation notice include the following details:
[1] the time by which the alleged violator must appear at the [City of Howell Municipal Civil Infraction] Bureau, [2] the methods by which an appearance may be made, [3] the address and telephone number of the Bureau, [4] the hours during which the Bureau is open, [5] the amount of the fine scheduled for the alleged violation, and [6] the consequences for failure to appear and pay the required fine within the required time.
The Notices that Donahue mailed to Shoemaker omit all but the final two items on the above list.
Although the City failed to fully comply with its own Ordinance, such a failure “does not ... automatically translate into a deprivation of procedural due process under the United States Constitution.” See DePiero v. City of Macedonia, 180 F.3d 770, 788 (6th Cir.1999) (holding that, although a parking citation failed to comply with state law, a deprivation of procedural due process did not occur because the City provided constitutionally sufficient notice). To satisfy due process under the Constitution, the notice must be “reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections,” and “must afford a reasonable time for those interested to make their appearance.” Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The notices here do just that.
Shoemaker was clearly aware that the City considered him to be in violation of the Ordinance. The mailed notices of violation and the door-hanger notices informed him of the nature of the alleged violation and the relevant section of the City Code. These notices also included the phone number of City Hall. Finally, the notices refer to the City’s Municipal Civil Infraction Ordinance, where Shoemaker could have learned about the procedures for objecting to the allegations against him. A simple investigation of the referred-to Ordinances or a call to City Hall would have answered Shoemaker’s questions, but he made no such effort. He “should not be able to now use [his] inaction against the [City] in claiming a violation of due process.” See Dubuc v. Twp. of Green Oak, 406 Fed.Appx. 983, 989 (6th Cir.2011) (holding that property owners who failed to take advantage of the zoning board’s postdeprivation appeals procedures could not claim that those procedures violated due process) (citing Santana v. City of Tulsa, 359 F.3d 1241, 1244 (10th Cir.2004)).
Although the notices in question were not perfect, the Constitution does not require strict adherence to the City’s Ordinances. What the Constitution does demand — that the notice as given be reasonably calculated to alert Shoemaker of the charges against him and any avenues available for challenging those *561 charges — was accomplished by the notices distributed by the City.
3. The Mathews factors indicate that due process was satisfied here
We next turn to the City’s procedures for challenging violations of the Ordinance. In doing so, we must determine if the procedures are constitutionally sufficient under the Mathews test.

a. Shoemaker’s property interest is relatively minor

First, the property interest at issue here — $600 in fines and fees over 16 months — is relatively minor. See Silvernail v. Cnty. of Kent, 385 F.3d 601, 605 (6th Cir.2004) (finding that a $25 assessment fee constituted a “minimal” property interest). Shoemaker did not go hungry or lose his house because of the $600 added to his property taxes in fees and fines. Compare Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (finding that the plaintiff was entitled to a predeprivation evidentiary hearing because the property interest at issue — welfare benefits — “provide[d] the means to obtain essential food, clothing, housing, and medical care.”), with Mathews, 424 U.S. at 343, 96 S.Ct. 893 (holding that an evidentiary hearing was not necessary pri- or to the termination of Social Security benefits, in part because “the hardship imposed upon the erroneously terminated disability recipient ... is likely to be less than that of a welfare recipient” such as the plaintiff in Kelly). In fact, Shoemaker was not actually deprived of his property until he was required to pay the $600 as part of the property taxes due upon the sale of his house in late'2012.

b. There is little risk of erroneous deprivation under the Ordinance

Moreover, the Ordinance presents a minimal risk of an erroneous deprivation. If the vegetation on the land in question is allowed to grow beyond eight inches tall, then the owner or occupier of that land, has violated the Ordinance. Due to this objective, readily ascertainable standard, there is little chance of a wrongful application of the law. See Sickles v. Campbell Cnty., 501 F.3d 726, 730 (6th Cir.2007) (finding that the risk of erroneous deprivation was “minor” where “[t]he withholding of funds involve[d] elementary accounting that has little risk of error”); Silvernail, 385 F.3d at 605 (citing with approval the district court’s finding that the risk of erroneous deprivation was low where “the proof of a bad check violation is the returned check itself’).

c.More process would add little value

The ample means of challenging an alleged violation under the laws of the City and the state of Michigan further counsel against the need for additional procedures. Under subsection (e) of the Ordinance, the City is authorized to bring any land in violation of the Ordinance into compliance and charge the land’s owner for any associated costs. City Code § 622.02(e). These charges are “either ... incorporated into a special assessment ... or ... entered upon the next tax roll as a charge against such premises and ... collected [as a] lien.” Id.
When the fines and fees are processed as a special assessment, Chapter 14 of the City Code requires the City Council to “prescribe a complete special assessment procedure.” City Code § 14.5. That procedure is laid out in City Code §§ 892.09-14, and requires that “all persons interested” in any special assessment be notified of the hearing before the Council where they may raise any objections related to the assessments against them. City Code § 829.09. In addition, Chapter 12 details the procedures related to those instances *562 where the fines and fees are entered as liens on the property. Like Chapter 14, Chapter 12 provides for both notice to those impacted and a forum — the Board of Review — where the homeowner may raise any objections to the charges against his or her property. City Code § 12.10.
Michigan law also provides an opportunity for review beyond the City’s predepri-vation procedures. Article VI, § 28 of the Michigan Constitution provides that
[a]ll final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judi-. cial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.
The fees and fines charged to Shoemaker by the City were therefore reviewable in state circuit court. See Carleton Sportsman’s Club v. Exeter Twp., 217 Mich.App. 195, 550 N.W.2d 867, 869 (1996) (holding that the township zoning board’s decision was subject to appellate review by the circuit court pursuant to Article VI, § 28).
Shoemaker argues that we should ignore these procedures, however, because the City failed to raise them in either its briefing below or before this court. These procedures were instead raised by the Michigan Municipal League and others, who filed an amici curiae brief in support of the City. Although we may not consider issues or arguments raised by amici “[t]o the extent that [those issues or arguments] exceed those properly raised by the parties,” Cellnet Commc’ns, Inc. v. FCC, 149 F.3d 429, 443 (6th Cir.1998), that is not what is happening here. Rather than raising new issues or arguments, the amici simply augmented the City’s position that it did not violate Shoemaker’s procedural due process rights because sufficient procedures were in place.
As Shoemaker would have it, however, amici’s role would be limited to parroting the briefs of the parties. But if that were true, amici would essentially serve no purpose whatsoever. “The traditional function of an amicus curiae is to assist in cases of general public interest by supplementing the efforts of private counsel and by drawing the court’s attention to law that might otherwise escape eonsider-ation[.]” See 3-28 Moore’s Manual — Federal Practice and Procedure § 28.84 (2014). This is exactly what the amici here have accomplished.

d. Additional process would require additional costs for the City

Finally, the City argues that the burden of added process here would be significant, and that the potential burden “militates against yet more process.” Shoemaker, for his part, argues that “if the City simply printed civil infraction tickets and allowed the local district court to handle the matter as it does all other civil infraction[s], the City would not incur much additional cost.” Although the City offers little evidence of the burden that additional process might pose, the fees and fines associated with the grass-cutting Ordinance are sufficiently small that added procedural safeguards would quickly outpace the monies collected as a result of enforcing the City Code.
Requiring additional procedures — such as an evidentiary hearing for each unkempt yard prior to the City having it mowed — would thus impose substantial costs with little corresponding benefit. See Silvernail v. Cnty. of Kent, 385 F.3d *563 601, 605 (6th Cir.2004); see also McKesson Corp. v. Div. of Alcoholic Bevs. & Tobacco, 496 U.S. 18, 87, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990) (“[A] State need not provide predeprivation process for the exaction of taxes. Allowing taxpayers to litigate their tax liabilities prior to payment might threaten a government’s financial security, both by creating unpredictable interim revenue shortfalls ... and by making the ultimate collection of validly imposed taxes more difficult.”).
Taken together, the four Mathews factors point to the conclusion that the City provided sufficient process under the circumstances and did not violate Shoemaker’s procedural due process rights. Our confidence in the soundness of this conclusion is all the stronger because Shoemaker made clear from the beginning that he had no interest in contesting whether the height of the grass on his curb strip complied with the ordinance. To the contrary, he readily conceded that it did not. The goal of his civil disobedience was instead to test the ordinance’s constitutionality, not to dispute his noncompliance with its terms.
But by not disputing the charges against him, Shoemaker is precluded from mounting a procedural-due-process claim against the City, even if a due-process violation had in fact occurred. See Graham v. Mukasey, 519 F.3d 546, 549-50 (6th Cir.2008) (“[T]o establish the requisite prejudice [to support a procedural-due-process claim], he must show that the due process violations led to a substantially different outcome from that which would have occurred in the absence of those violations.”); Watson ex rel. Watson v. Beckel, 242 F.3d 1237, 1242 (10th Cir.2001) (concluding that where a military student was expelled after admitting that he assaulted his roommate, the student’s claim for procedural due process due to lack of notice failed because additional notice would not have allowed him to better defend his claim); Keough v. Tate Cnty. Bd. of Educ., 748 F.2d 1077, 1083 (5th Cir.1984) (“Keough admitted the charges and therefore his suspension did not result from a procedural due process deprivation.”); Black Coalition v. Portland Sch. Dist. No. 1, 484 F.2d 1040, 1045 (9th Cir.1973) (declining to order a new hearing because the student had “admitted all of the essential facts which it is the purpose of a due process hearing to establish”). Our dissenting colleague’s protestations about the allegedly inadequate notice given Shoemaker thus strike us as particularly unpersuasive in the context of the present case.
C. The City did not violate Shoemaker’s substantive due process rights because Shoemaker had a shared ownership interest in and the de facto use of the curb strip
Shoemaker also claims that the City violated his substantive due process rights by forcing him to maintain the curb strip adjacent to his lawn, which he contends is City-owned property. The district court granted summary judgment in favor of Shoemaker on this basis, finding that (a) the City had conceded that it owned the curb strip in front of Shoemaker’s house, (b) “the right not to be forced by a municipal government to maintain municipal property” is a fundamental one, and (c) the Ordinance “unconstitutionally infringes” on that right. Contrary to the district court’s findings, however, the City never conceded that it is the sole owner of the land in dispute. A more accurate reflection of the City’s position is found in its motion for summary judgment, where it discusses the “incremental effort or expense in maintaining [the curb strip] in conjunction with the rest of [Shoemaker’s]property.” (emphasis added).
*564 In fact, under Michigan law, Shoemaker technically owned the property at all relevant times and the City simply possessed a right of way for public use. See Loud v. Brooks, 241 Mich. 452, 217 N.W. 34, 34-35 (1928) (holding that “a conveyance of land bounded on a highway, street, or alley carries with it the fee to the center thereof, subject to the easement of public way”). The reasoning of the district court’s opinion relies entirely on the inaccurate determination that the City is the sole owner of the curb strip. Given Shoemaker’s shared ownership interest in the curb strip as well as his de facto use thereof, no substantive due process violation occurred.

1. Legal standard

This court has referred to substantive due process as “[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.” Pearson v. City of Grand Blanc, 961 F.2d 1211, 1216 (6th Cir.1992) (internal quotation marks omitted) (quoting Comment, Developments in the Law—The Constitution and the Family, 93 Harv. L.Rev. 1156, 1166 (1980)); see also Zinermon v. Burch, 494 U.S. 113, 125, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990). What type of “limitations” the Constitution imposes on such governmental deprivations depends on the nature of the right being deprived. Specifically, “[government -actions that do not affect fundamental rights ... will be upheld if [ ] they are rationally related to a legitimate state interest.” Seal v. Morgan, 229 F.3d 567, 575 (6th Cir.2000) (citing Vacco v. Quill, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997)). When government actions do impact an individual’s fundamental rights, however, the courts will apply the rigorous strict-scrutiny standard to the alleged deprivation. Reno v. Flores, 507 U.S. 292, 301-02, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).
The district court acknowledged that “the [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this un-chartered area are scarce and open-ended,” citing Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Despite this ac-knowledgement, however, the district court proceeded to expand the concept by identifying a new fundamental right: “the right not to be forced by a municipal government to maintain municipal property.”

2. At all relevant times, Shoemaker had a property interest in the curb strip adjacent to his residence

According to the district court, “the City ... does not contest that it owns the property at issue.” But the court did not cite any evidence to support this finding. To the contrary, the City has consistently maintained that, although it has an easement over the curb strip, it possesses only a shared interest in that land. Because the district court failed to cite any factual support for its finding, we have examined the evidence that Shoemaker marshals in support of his similar argument that “[t]he City has repeatedly admitted that it owns the land in fee.”
Our examination reveals that Shoemaker has substantially overstated the evidence in his favor. Two examples are illustrative of this point. First, Shoemaker notes the following response by the City to his motion to compel discovery:
Initially, Defendant questioned whether Mr. Shoemaker might own all or part of the [curb strip]. However, this is a distinction without a difference in terms of Mr. Shoemaker’s duty to maintain the [curb strip]. The City now, after speaking with engineers, does not dispute that *565 Plaintiff does not “own” the [curb strip] at issue.
Second, Shoemaker points to the following interaction at oral argument on the cross-motions for summary judgment:
[COUNSEL FOR THE CITY]: ... [Shoemaker’s] responsible to remove [the vegetation] under the Noxious Weed Ordinance and Statute.
THE COURT: On your property?
[COUNSEL FOR THE CITY]: On the city property, yes — well, on the public right of way. Your Honor, although the city may own it, it does not have the same kind of ownership rights as a normal person....
Shoemaker argues in his brief that both of these comments prove that the City has “confirmed that [it] owned the property.” In reality, however, both statements, though inartful, do not concede the City’s exclusive control. Rather, they reflect the complexity of the “bundle of sticks” that constitutes property ownership, see United States v. Craft, 535 U.S. 274, 278, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002) (citing B. Cardozo, Paradoxes of Legal Science 129 (1928) (reprint 2000)), particularly in the context of public use. Shoemaker also ignores the fact that Code Enforcement Officer Donahue told him in August 2011 that the curb strip belonged to Shoemaker and not to the City.
More importantly, the City’s position is consistent with the property law of Michigan. Both parties refer extensively to the relatively recent case of 2000 Baum Family Trust v. Babel, 488 Mich. 136, 793 N.W.2d 633 (2010). The Michigan Supreme Court in Baum dealt with the issue of what effect a public right of way between a lake-front property and the water had on the landowner’s rights. After exhaustively reviewing the history of Michigan property law, the Court concluded that “[t]he owner of property abutting upon a street sustains a threefold relation to the street: 1. As one of the general public. 2. As owner of the reversionary interest to the center of the street. 3. As owner of a lot, possessed of the right of ingress and egress to and from the street.” Id. at 644 (citing Detroit City Ry. Co. v. Mills, 85 Mich. 634, 48 N.W. 1007, 1010 (1891)) (internal quotation marks omitted).
The Michigan Supreme Court based its conclusion on Michigan’s 19th-century plat acts:
[B]y the turn of the last century, this Court had provided ample direction on the nature of the property interest created by the early plat acts. Through a conveyance by a platting statute, the county does not receive title in the nature of a private ownership; it acquires no beneficial ownership of the land and has no voice concerning the use; and it does not possess the usual rights of a proprietor, but rather takes title only to the extent that it could preclude questions which might arise respecting the public uses, other than those of mere passage. Simply put, the law vests the governmental entity with nominal title. We pause at this word ‘nominal’ to emphasize the obvious, i.e., that the property interest conveyed by these early platting statutes is a fee in name only.
Id. at 650 (internal quotation marks, citations, alterations, and emphases omitted). Under Baum, therefore, Michigan cities possess “nominal” title to land designated for public use pursuant to one of the plat acts, while the private property owners retain “the usual rights of the proprietor.”
This relationship reflects the reality that' homeowners like Shoemaker have a special interest in the curb strips adjacent to their houses because these strips of land are, for all practical purposes, simply extensions of the homeowners’ lawns. The curb strips also provide a traffic and safety buffer between the street and the rest of the *566 property. In other words, despite the City’s right of way over the curb strip for public use, Shoemaker retained both his property interest in and de facto use of the land in question. The error by the district court in reaching the opposite conclusion permeates the remainder of its opinion.

3. The Ordinance does not impair a fundamental right

In light of Shoemaker’s ownership interest in the curb strip, no fundamental right is impacted by the Ordinance’s requirement that he mow and otherwise maintain that land. As discussed above, the Supreme Court has identified very few fundamental rights (none of which are at issue here), and this court has acknowledged the stricture against expanding that brief list. See Seal v. Morgan, 229 F.3d 567, 574-75 (6th Cir.2000) (holding that, although no fundamental right was impaired by plaintiffs expulsion under his high school’s “Zero Tolerance Policy,” the Policy as applied could not sustain even rational-basis review). This court has summarized the existing fundamental rights as “those protected by specific constitutional guarantees, such as the Equal Protection Clause, freedom from government actions that ‘shock the conscience,’ and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental.” Bell v. Ohio State Univ., 351 F.3d 240, 250 (6th Cir.2003) (internal citation omitted).
On this score, Shoemaker suggests that the Ordinance is somehow un-American. But Shoemaker’s argument, like the district court’s opinion, relies on the erroneous assumption that the City is the sole owner of the curb strip. Shoemaker specifically compares the requirement that he maintain the curb strip associated with his property to draconian mandatory public-labor measures adopted by regimes in troubled nations such as the Republic of the Congo, Uzbekistan, and Burma/Myanmar. These analogies are almost too outlandish to address. But even more hy-perbolically, Shoemaker argues that the Ordinance “makes the City look like North Korea rather than an American city.”
This final comparison should come as a surprise to the citizens of both nations. On the one hand, North Korea is a totalitarian regime that notoriously tortures criminal defendants, executes non-violent offenders, and sends those accused of political offenses to “brutal forced labor camps.” Human Rights Watch, World Report 2015: North Korea, http://www.hrw. org/world-report/2015/country-chapters/ north-korea (last visited July 27, 2015). Ordinances like the one challenged here, on the other hand, are ubiquitous from coast to coast. In fact, a cursory internet query reveals similar ordinances in countless municipalities across the country. See, e.g., San Marino, Cal., City Code § 18.03.05, available at http://www.sterling eodifiers.com/codebook/getBookData.php? chapter_id=57670# 740049; Memphis, Tenn., City Code § 48-89, available at http://www.memphistn.gov/Government/ PublicWorksCodeEnforcement/CityCode List/Sec4889.aspx; Neighbor’s Tall Grass Got You Down? Here’s What to Do, Fair-fax Cnty., Va., http://www.fairfaxcounty. gov/braddock/newsletter/june2010/grass. htm (discussing Fairfax County Code § 119-3). This suggests that the Ordinance in question is not nearly as conscience-shocking or draconian as Shoemaker would make it out to be. In sum, the Ordinance does not impair a fundamental right and, therefore, rational-basis review is the proper standard.

4. The Ordinance survives rational-basis review because it is related to legitimate government interests

Where, as here, an ordinance “does not proscribe fundamental liberties,” *567 it may “nonetheless violate[ ] the Due Process Clause where it imposes burdens without any rational basis for doing so.” Sheffield v. City of Fort Thomas, 620 F.3d 596, 613 (6th Cir.2010) (quoting United States v. Comstock, 560 U.S. 126, 150, 130 S.Ct. 1949, 176 L.Ed.2d 878 (2010) (Kennedy, J., concurring) (internal quotation marks omitted)). “This standard is highly deferential; courts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances.” Doe v. Mich. Dep’t of State Police, 490 F.3d 491, 501 (6th Cir.2007). “Under rational basis scrutiny, government action amounts to a constitutional violation only if it is so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the government’s actions were irrational.” Michael v. Ghee, 498 F.3d 372, 379 (6th Cir.2007) (internal quotation marks omitted). “[T]he burden is on [the plaintiff] to show that there is no rational connection between the enactment and a legitimate government interest.” Sheffield, 620 F.3d at 613 (internal quotation marks omitted).
This court has previously examined a very similar ordinance under rational-basis review in Rowe v. City of Elyria, 38 Fed.Appx. 277 (6th Cir.2002). In Rowe, the court upheld the grass-mowing ordinance before it on the grounds that it was rationally related to Elyria’s “legitimate governmental purposes relating to aesthetics and vermin control.” Id. at 282. The City here similarly defends the Ordinance in question by arguing that it advances the following interests: “traffic safety, sanitation, animal and rodent control, protection of property values, aesthetics, and public health, safety, and welfare.” Both the Supreme Court and this court have recognized several of these interests as legitimate in other contexts. See, e.g., Berman v. Parker, 348 U.S. 26, 33, 75 S.Ct. 98, 99 L.Ed. 27 (1954) (“It is within the power of the legislature to determine that the community should be beautiful”); H.D.V.—Greektown, LLC v. City of Detroit, 568 F.3d 609, 623 (6th Cir.2009) (holding that safety and aesthetics are legitimate governmental interests) (citing Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 509-510, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981)); Harris v. Akron Dept. of Public Health, 10 Fed.Appx. 316, 319 (6th Cir.2001) (identifying property values, aesthetics, and the health, safety, and welfare of the public as legitimate governmental interests.) We find no reason not to attribute these legitimate governmental interests to the Ordinance in question.
This is not to say that the City’s powers in this context are unlimited. For instance, the outcome would likely be different if the City required homeowners to mow large tracts of public land totally unrelated to their individual residences, but such is clearly not the case here. Under Michigan law, ownership of the curb strip in question was shared by Shoemaker and the City, and he had the de facto use of the land. These factors make the mowing burden placed upon him constitutionally acceptable.
Because no fundamental right is implicated by the City’s requirement that Shoemaker mow the curb strip associated with his house and because that requirement is rationally related to a legitimate governmental purpose, the Ordinance did not violate Shoemaker’s substantive due process rights. The district court’s contrary conclusion is erroneous.
D. Other potential causes of action
Shoemaker’s briefs touch on other legal questions that ultimately are not properly before us. For instance, Shoemaker hints that the City acted outside the bounds of its right-of-way easement over the curb strip by removing Shoemaker’s tree without compensating him and then replacing *568 it with nine saplings. But no such claim is before us because he never fully developed it here or below.
Shoemaker also brings up the specter of a potential trespass claim is in his appellate brief, wherein he suggests that “[t]he City either trespassed on private property and relandscaped it in violation of the Fourth Amendment, or it simply changed the plantings on its own property.” But Shoemaker dropped his Fourth Amendment claim before summary judgment below and explicitly disclaimed the notion of trespass during oral argument before this court, stating that “We couldn’t bring a trespass claim because it wasn’t our property.” We therefore have no need to deal with these issues.
III. CONCLUSION
For all the reasons set forth above, we REVERSE the judgment of the district court and REMAND the case with instructions to dismiss Shoemaker’s complaint.