IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| FRIENDS OF MOON CREEK, an unincorporated association, CHERYL and ROBERT BALENTINE, the ESTATE OF DOUGLAS M. ANDERSON, TOM and MICHELE BOWYER, GEORGE A. TYLER, MARK and CYNTHIA MOESER, JOE F. STRUTHERS, and GAYLAN and HEATHER WARREN, | ) ) ) ) ) ) ) ) ) | No. 34938-1-III |
| Respondents, | ) ) | PUBLISHED OPINION |
| v. | ) ) | |
| DIAMOND LAKE IMPROVEMENT, ASSOCIATION, INC.; SHARON SORBY, individually and as COORDINATOR, PEND OREILLE COUNTY NOXIOUS WEED CONTROL BOARD; and PHIL ANDERSON, individually and as DIRECTOR, WASHINGTON DEPARTMENT OF FISH AND WILDLIFE, | ) ) ) ) ) ) ) ) ) ) ) | |
| Petitioners. | ) | |

SIDDOWAY, J. —After ruling on summary judgment that Sharon Sorby did not

enjoy qualified immunity from the plaintiffs' claims under 42 U.S.C. § 1983, the trial

court certified its order under RAP 2.3(b)(4) as one "involv[ing] a controlling question of law as to which there is substantial ground for a difference of opinion." We granted discretionary review. We conclude that Ms. Sorby enjoys qualified immunity and reverse.

FACTS AND PROCEDURAL BACKGROUND

Sharon Sorby is the coordinator of the Pend Oreille County Noxious Weed Control Board. After properties bordering Diamond Lake were flooded, the weed board, in conjunction with Diamond Lake Improvement Association, considered eradicating reed canary grass, *Phalaris arundinacea*, a noxious weed growing along the banks of Moon Creek, to improve outflow from the lake. In order to proceed, they obtained a permit from the Washington State Department of Ecology that authorized applying certain chemicals to noxious weeds. Ms. Sorby also obtained a letter from the Washington State Department of Agriculture appointing her and the weed board as the department's limited agents to carry out weed control.

To provide notice to residents or businesses adjacent to the area the weed board expected to treat, Ms. Sorby consulted a parcel map to obtain names and addresses. On May 3, 2012 and June 12, 2012, she sent letters by United States mail to persons she believed were entitled to notice, whom she described as the "owners/taxpayers of the properties bordering Moon Creek." Clerk's Papers (CP) at 24. The first letter provided

2

notice that the weed board and improvement association would be inspecting banks along Moon Creek in preparation for a joint project to remove reed canary grass. The second provided details of the anticipated herbicide application, stating in part that the applications would be made by backpack sprayer and "[t]he anticipated date of treatment is the week of June 18, 2012, specifically Friday the 22nd, providing the wind is within tolerances to prevent off-site drift." CP at 38. An enclosure to the second letter, entitled "Herbicide Treatment Business and Residential Notice," stated, "The shorelines along Moon Creek will be treated with an aquatic herbicide on or between June 22 and June 30," and, "The target date is June 22." CP at 39. The second letter and its enclosure both stated that treatment would be with an herbicide with the active ingredient glyphosate, but the enclosure also stated, "Product planned for use: Touchdown." *Id.*

Ms. Sorby received a response to the notice from Cheryl Balentine, who voiced concerns about the effects of the herbicide on her garden and livestock. The only other responses Ms. Sorby received were from two property owners who did not object to the proposed application. None of her letters was returned as undeliverable.

The herbicide application was not performed during the time frame originally projected. On the afternoon of July 5, 2012, Ms. Sorby sent electronic mail to Ms. Balentine, stating:

> I just wanted to let you know since treatment on Moon Creek was not able to be performed 2 weeks ago, we will be attempting treatment tomorrow with an air boat. The applicators will be on-site at 6:30 AM.

3

CP at 256.  The herbicide was applied on July 6, 2012, by air boat.

A number of property owners claim the herbicide application destroyed vegetation up to 100 feet from the banks, killed animal and marine life in and around the stream, and contaminated potable well water.

In May 2015, Friends of Moon Creek, an unincorporated association; 10 individuals; and an estate, filed the action below.[1]  They alleged, among other claims, a violation of 42 U.S.C. § 1983.  Their § 1983 claim contends that Ms. Sorby deprived them of property in violation of two federal constitutional rights: the Fifth Amendment right against governmental taking of private property without just compensation, and the Fourteenth Amendment right against deprivation of property without due process of law.

The plaintiffs later moved for summary judgment in their favor.  Ms. Sorby filed a cross motion for summary judgment on her defense of qualified immunity.

In declarations filed in support of the plaintiffs' motion, one of the plaintiffs contends he did not receive either of Ms. Sorby's letters, although he admits the address to which Ms. Sorby claims she mailed the letter is his.  Three plaintiffs admit receiving Ms. Sorby's letters but claim they did not know whether the notice applied to them

---

[1] The original complaint is not included in our record.  We are assuming the original plaintiffs were the same parties identified in pleadings that are in the record.

4

because the letter did not include their names or an identification of their property. One plaintiff testified

that the reference to the area to be treated as "Moon Creek" was confusing because while the stream at issue flowed through the real estate subdivision called "Moon Creek Estates 3d Addition," was identified on the plat as "Moon Creek," and was locally called "Moon Creek," county maps locate Moon Creek several miles west.

In ruling on the cross motions for summary judgment, the trial court determined that Ms. Sorby's notice did not comply with RCW 17.10.170, a provision of Washington's noxious weed control law that requires notice to be provided by certified mail. The trial court also concluded that Ms. Sorby was ineligible for the qualified immunity defense. It denied summary judgment on other issues, finding that genuine issues of fact remained.

At Ms. Sorby's request, the trial court certified its order on qualified immunity under RAP 2.3(b)(4) as presenting a controlling question of law on which there was a substantial ground for a difference of opinion. Ms. Sorby moved for discretionary review, which our commissioner granted.

## ANALYSIS

The purpose of Washington's weed control statutes is "to limit economic loss and adverse effects to Washington's agricultural, natural, and human resources due to the presence and spread of noxious weeds on all terrestrial and aquatic areas in the state."

RCW 17.10.007. A "noxious weed" is a plant that "when established is highly destructive, competitive, or difficult to control by cultural or chemical practices." RCW 17.10.010(1). A statutory duty is imposed on owners of land to either eradicate or control the noxious weeds designated for control by state, regional or county boards. RCW 17.10.140. Weed control board employees are authorized to enter private land, with prior notice, to inspect and take specimens of weeds. RCW 17.10.160. If a weed control board finds that noxious weeds are not being controlled by an owner, it notifies the owner that a violation of the chapter exists and orders corrective action within a period of not less than 10 days. RCW 17.10.170(1). If corrective action is not taken by the owner within the time provided, the county board may control the weeds, or cause their being controlled, at the expense of the owner. RCW 17.10.170(3). It can also issue a notice of civil infraction. RCW 17.10.170(2).

The doctrine of qualified immunity shields government officials like Ms. Sorby who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). It "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties

6

reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).

Review of the order on qualified immunity presents two questions. The first is whether the facts the plaintiffs have alleged or shown make out a violation of a constitutional right. *Id*. at 232. The second is whether the right at issue was "'clearly established'" at the time of the defendant's alleged misconduct. *Id.* The prevailing view is that once the defense of qualified immunity is properly raised, the plaintiff has the burden of showing the defendant violated a clearly established federal right. MARTIN A. SCHWARTZ, SECTION 1983 LITIGATION (3d ed. 2014) at 154 & n.1291 (citing cases).

Courts are required to determine the right at issue, and whether it is clearly established or not, on the basis of the specific context of the case. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866-67, 188 L. Ed. 2d 895 (2014). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). While this does not require a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* "[I]n the light of pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640 (citation omitted).

We review an order of summary judgment de novo, performing the same inquiry as the trial court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). Summary judgment is proper when there is "no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." CR 56(c). Where the defense seeks summary judgment on the qualified immunity issue, the court must view the evidence in the light most favorable to the plaintiff. *Tolan*, 134 S. Ct. at 1866-67.

A moving defendant meets the initial burden of demonstrating no genuine issue of material fact by pointing out that there is an absence of evidence to support the plaintiff's case. If a moving defendant makes this initial showing, then the plaintiff must set forth specific facts demonstrating a genuine issue for trial. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989), *overruled in part on other grounds by* 130 Wn.2d 160, 922 P.2d 59 (1996). The complete failure of proof concerning an essential element, "'renders all other facts immaterial.'" *Id.* (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

To summarize, in this appeal we review whether the plaintiffs have demonstrated that it was clearly established in July 2012 that (1) a government's herbicide application on private property can constitute a taking of property, or (2) application of an herbicide can deprive the owner of the treated land of a protected property interest and Ms. Sorby's notice was constitutionally inadequate.

### 1.    The alleged Fifth Amendment "taking"

We first address whether it was clearly established in July 2012 that damage to flora or fauna from the application of an herbicide can constitute a taking of private property that requires the payment of just compensation under the Fifth Amendment. The plaintiffs assume that a taking occurred and proceed with their argument from there. But it is not clear now, nor was it in 2012, that spraying an herbicide that causes the type of damage complained of constitutes a taking.

"The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 123, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978).  There is no "'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons." *Id.* at 124.  Whether a taking has occurred depends largely on the individual circumstances of a case, and is essentially an ad hoc inquiry.  *Id.*

"The clearest sort of taking occurs when the government encroaches upon or occupies private land for its own proposed use," and decisions by the United States Supreme Court establish that "even a minimal 'permanent physical occupation of real property' requires compensation under the Clause." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 150 L. Ed. 2d 592 (2001) (quoting *Loretto v. Teleprompter*

*Manhattan CATV Corp.*, 458 U.S. 419, 427, 102 S. Ct. 3164, 73 L. Ed. 2d 868 (1982)).

For example, it has long been established that government induced flooding can

constitute a taking. *Pumpelly v. Green Bay & Miss. Canal Co.*, 80 U.S. 166, 181, 20 L.

Ed. 557 (1871). In *Pumpelly*, the state's construction of a dam created a lake that

permanently submerged the plaintiff's land. *Id.* at 176-77. Rejecting the government's

contention that the damage was merely a consequential result of the dam's construction,

the United States Supreme Court held that "where real estate is actually invaded by

superinduced additions of water, earth, sand, or other material, or by having any artificial

structure placed on it, so as to effectually destroy or impair its usefulness, it is a taking,

within the meaning of the Constitution." *Id.* at 181.

Since *Pumpelly* was decided, the Supreme Court "has consistently distinguished

between flooding cases involving a permanent physical occupation, on the one hand, and

cases involving a more temporary invasion, or government action outside the owner's

property that causes consequential damages within, on the other." *Loretto*, 458 U.S. at

428 (citing cases). A temporary physical invasion is not automatically exempt from a

takings clause analysis. Time is "indeed a factor," but other factors are relevant,

including "the degree to which the invasion is intended or is the foreseeable result of

authorized government action," "the character of the land at issue and the owner's

'reasonable investment-backed expectations' regarding the land's use," and the

"[s]everity of the interference." *Arkansas Game & Fish Comm'n v. United States*, 568

10

U.S. 23, 38-39, 133 S. Ct. 511, 184 L. Ed. 2d 417 (2012) (quoting *Palazzolo*, 533 U.S. at 618).

Government action outside of property that causes consequential damage has "long and consistently" been recognized as distinct from a taking. *Batten v. United States*, 306 F.2d 580, 583 (10th Cir. 1962). "[G]overnmental activities which do not directly encroach on private property are not a taking within the meaning of the Fifth Amendment even though the consequences of such acts may impair the use of the property." *Id.* (citing *Transp. Co. v. City of Chicago*, 99 U.S. 635, 642, 25 L. Ed. 336 (1878); *United States v. Willow River Power Co.*, 324 U.S. 499, 65 S. Ct. 761, 89 L. Ed. 1101 (1945)).

In *Harris v. United States*, 205 F.2d 765 (10th Cir. 1953), the court analyzed whether herbicide drift that damaged crops on privately-owned farm ground was a taking under the Fifth Amendment, and found that it was not. The court found the damages were incidental, and thus, noncompensable, stating that it did "not understand that a single isolated and unintentional act of the United States resulting in damage or destruction of personal property amounts to a taking in a constitutional sense. It is, we think, rather a tortious act for which the government is only consensually liable." *Id.* at 768; *see also Keokuk & Hamilton Bridge Co. v. United States*, 260 U.S. 125, 43 S. Ct. 37, 67 L. Ed. 165 (1922) (holding that incidental damage to a plaintiff's pier resulting from non-negligent government blasting was not a taking).

The spraying here could be said to have caused a physical invasion of sorts—the herbicide directly touched land owned by plaintiffs and evidence was presented that it seeped into the soil up to 100 feet from the banks. But this was a one-time occurrence, and the plaintiffs have not presented evidence that it will cause permanent damage. The plaintiffs have failed to identify any case in which spraying an herbicide was held to be a constitutional "taking."

We need not decide as a matter of law that there was no "taking." We have no doubt that there was no "clearly established right" to just compensation from herbicide-caused damage to flora or fauna that would have been known to every weed control official in July 2012.

### 2. *The alleged violation of procedural due process*

"To assess whether an individual was denied procedural due process, 'courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process.'" *Hatfield v. Bd. of County Comm'rs*, 52 F.3d 858, 862 (10th Cir. 1995) (quoting *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994)).

PROPERTY INTEREST

The plaintiffs testify in their declarations that a 100 foot plus wide zone of dead plant life was left following the herbicide application, stream fish life was destroyed,

12

animals and birds have left the area, and their water now has a nasty smell and taste. They appear to contend that all of these harms deprive them of private property.

Significant in this case, no deprivation of property occurs within the meaning of the due process clause when an unintended loss of or injury to property is the result of *negligent* conduct on the part of state officials. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). "Injury caused by lack of due care is . . . not 'the sort of abusive government conduct that the Due Process Clause was designed to prevent.'" *Mitchell v. Mills County, Iowa*, 847 F.2d 486, 489 (8th Cir. 1988) (quoting *Davidson v. Cannon*, 474 U.S. 344, 347-48, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986) (citing *Daniels*, 474 U.S. at 331-33)). Thus in *Mitchell*, the plaintiffs' § 1983 claim for damage to their farm ground from wastewater runoff from a county road project was dismissed on summary judgment where the plaintiffs "failed to produce evidence sufficient to allow a reasonable trier of fact to conclude that county officials deliberately damaged their property." *Id.* at 489.

Focusing on Ms. Sorby's intentional conduct, the plaintiffs have presented no evidence that she deliberately damaged anything other than reed canary grass. Thus, the first step of the deprivation analysis is only whether the plaintiffs possessed a protected property interest in reed canary grass growing on their land. To determine whether Ms. Sorby enjoys qualified immunity, the further question is whether it was clearly

established as of July 2012 that applying an herbicide to eradicate noxious weeds could deprive property owners of a protected property interest in the weeds.

Property interests do not arise out of the Constitution, but "[r]ather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . ." *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972). Plaintiffs have not identified any § 1983 action in which a court has found a property owner to have a protected property interest in noxious weeds or other uncultivated plants. We have identified a few cases in which plaintiffs were held *not* to have a protected property interest in more beneficial natural phenomena. In *Coastal Habitat Alliance v. Public Utility Commission of Texas*, 294 S.W.3d 276, 287 (Tex. App. 2009), for example, the court held that the plaintiffs had no vested property right in wildlife or the viewing, enjoyment or hunting thereof, even when harm to the wildlife might affect their property value or business interests. And a federal district held the plaintiffs who complained about water use by defendant drainage districts had no property interest in water flowing in a river. As the court observed, "There can be no taking of a public resource . . . ." *Delaware County Safe Drinking Water Coal., Inc. v. McGinty*, No. 07-1782, 2008 WL 2229269, at *1 n.1 (E.D. Penn. May 27, 2008) (court order).

Whether the plaintiffs had a protected property interest in the reed canary grass growing on their property is doubtful, but we need not decide that issue. We have no

doubt that there was no "clearly established" property interest in noxious weeds that would have been known to every reasonable weed control official in July 2012.

NOTICE

We turn last to the constitutional adequacy of the notice provided by Ms. Sorby. Given the absence of a clearly established constitutional right, it is not necessary to the result but is addressed as an alternative basis for our decision.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 94 L. Ed. 865 (1950). "The notice must be of such nature as reasonably to convey the required information . . . and it must afford a reasonable time for those interested to make their appearance." *Id.*

The plaintiffs offer three reasons why they believe Ms. Sorby's notice was constitutionally deficient: (1) she addressed the notices to "Landowners and Residences Along Moon Creek" rather than to each landowner by name, (2) she gave incorrect information about the nature and dates of the spraying,[2] and (3) the one e-mail

---

[2] On the issue of the "nature" of the spraying, the plaintiffs point to the fact that the herbicide applied was of a brand other than that identified in one of the notices (although it contained the active ingredient identified by Ms. Sorby) and was applied from an air boat rather than by backpack sprayer.

notification that provided correct information was sent to only one of the landowners, 14 hours in advance. Br. of Resp'ts at 23.

The principal purpose of the notice required by Washington's weed control statutes is to make the owner aware of an impending entry on land, the purpose for the entry, and to give the owner the opportunity to cure a violation, without government intervention, liability for the cost, or issuance of an infraction. To that end, when a weed board employee intends to enter private property, the statute requires only that "[p]rior to carrying out the purpose for which the entry is made, the official making such entry or someone in his or her behalf, shall make a reasonable attempt to notify the owner of the property as to the purpose and need for the entry." RCW 17.10.160. When a weed board orders that a violation be cured and intends to act if it is not, the statute imposes only the following requirements on notice:

> The notice shall be in writing and sent by certified mail, and shall identify the noxious weeds found to be present, order prompt control action, and specify the time, of at least ten days from issuance of the notice, within which the prescribed action must be taken. Upon deposit of the certified letter of notice, the noxious weed control authority shall make an affidavit of mailing that is prima facie evidence that proper notice was given.

RCW 17.10.170. If corrective action is not taken within the 10 day or greater time frame afforded by the weed board, chapter 17.10 RCW does not require any further notice before the weed board takes action to control the noxious weeds.

16

Ecology's permit required some information to be given to property owners about the planned application of an herbicide. Relevant to mailed notice, the permit stated:

a. The Permittee must notify private residents/businesses immediately adjacent to any treated area before chemical application, or as an alternative to notification, post the treated area[.] The Permittee may provide notice the same day as treatment.

b. If notifying under 1.a., the Permittee must provide notice to the resident/business by a notification form, letter, flyer, or a personal conversation. The notice must explain the purpose of the treatment, identify the herbicide used, any re-entry or water use restrictions, and provide the location of the treated area(s) in relation to the residence/business.

CP at 33.

The weed board's undertaking in this case was somewhat atypical. It appears the weed board never intended to require property owners along Moon Creek to control the reed canary grass themselves or, failing that, to suffer civil infractions or liability for the cost. Perhaps for that reason, Ms. Sorby did not send the notice by certified mail. It has already been determined that the notice she provided violated RCW 17.10.170 in that respect. But the issue in this case is whether the notice was constitutionally sufficient. As the plaintiffs concede, compliance with state law is not controlling. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985); *Danielson v. City of Seattle*, 108 Wn.2d 788, 797 n.3, 742 P.2d 717 (1987).

In a different context—whether laws requiring abatement of a vegetative nuisance require a hearing before the government takes action to abate—one court has

characterized property owners as having no constitutionally significant property interest in weeds. *Sobocinski v. City of Williamsport*, 13 Pa. Commw. 425, 319 A.2d 697, 701 (1974). The court stated it "cannot think of a less 'significant' property interest than the Uncultivated weeds and grass 'taken' from Appellant." *Id.* In another case, *Shoemaker v. City of Howell*, 795 F.3d 553 (6th Cir. 2015), the plaintiff homeowner challenged the procedural constitutionality of a law that required him to mow the lawn between the sidewalk and the curb. He did not claim to have a property interest in grass the city cut at his expense, relying instead on a $600 fine imposed as the deprivation of property that entitled him to procedural due process. In rejecting the homeowner's argument that he should have been given a pre-abatement hearing, the Sixth Circuit court found even the $600 fine to be a "relatively minor" property interest. *Id.* at 561.

Notably, in *Shoemaker*, somewhat like this case, the notice of planned abatement given to the homeowner did not comply with four of six notice requirements imposed by city ordinance. But the court found it still satisfied the Fourteenth Amendment's requirement that it be reasonably calculated to apprise the homeowner of pending action and give the homeowner an opportunity to present any objections. *Id.* at 560 ("Although the notices in question were not perfect, the Constitution does not require strict adherence to the City's Ordinances."). The court observed that if the homeowner had any questions, the city's notice provided him with contact information and a reference to applicable law and "[a] simple investigation of the referred-to Ordinances or a call to City Hall would

18

have answered [his] questions, but he made no such effort. He 'should not be able to now use [his] inaction against the [City] in claiming a violation of due process.'" *Id.* (some alterations in original) (quoting *Dubuc v. Twp. of Green Oak*, 406 F. App'x. 983, 989 (6th Cir. 2011)).

As to the content of the notice, Ms. Sorby's notice provided the material information as to the noxious weed that would be controlled, the anticipated time frame, a correct identification of the active ingredient to be used, and the intended product name and manner of application. It provided recipients with the weed board's telephone and fax numbers, its street address, and her e-mail address. Both notices invited recipients to contact the weed board with any questions. In some respects, it provided more details than Washington weed control statutes or Ecology's permit required.

While some owners claim not to have received the notice, "*Mullane* makes clear . . . [that] the proper inquiry is not whether [an individual] received the notices but instead whether the method of providing the notices was 'reasonably calculated, under all the circumstances,' to inform him" of an action and his right to object. *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1486 (D.C. Cir. 1992) (quoting *Mullane*, 339 U.S. at 314-15). Plaintiffs do not discredit Ms. Sorby's testimony about how she mailed the notice since most of them admit receiving it. As for recipients who questioned whether the notice applied to them because it did not include their name or identify their land, the

proper inquiry is not what questions were in their minds. It is, again, whether her notice was reasonably calculated to provide the required information.

While not perfect, the notice provided by Ms. Sorby was reasonably calculated to apprise land owners of pending action by the government and to give them an opportunity to present any objections.

We reverse the trial court's summary judgment on qualified immunity and remand with directions to dismiss the plaintiffs' claims against Ms. Sorby.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.