NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0206n.06

Case No. 18-1589

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Apr 13, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DAVID KIRCHER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| CITY OF YPSILANTI, et al., | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | **OPINION** |
| | ) | |

BEFORE: SUTTON, NALBANDIAN, and READLER, Circuit Judges

NALBANDIAN, Circuit Judge. This litigation between David Kircher and Defendants began in Michigan state court in the late 1980s as nuisance-abatement suits over three properties Kircher owned. During the litigation, Kircher lost all three properties. Over a decade later, Kircher hopes to continue the litigation in federal court and receive compensation for his losses. He asks this court to give him that chance. But life rarely gives do-overs. And this litigation is no different. We find the Michigan state courts' decisions preclude Kircher from raising the federal claims he wants to now litigate in federal court. So Kircher's claims fail. We AFFIRM the district court's decision granting Defendants' motion to dismiss and rejecting Kircher's second motion to amend.

**I.**

The claims Kircher wants to now raise in federal court relate to events spanning over a decade and across multiple appeals and remands in state court. To determine the merits of Kircher's claims, we must now revisit the long and relevant procedural history.

**A.**

In the late 1980s, this epic began. *See Ypsilanti Fire Marshal v. Kircher*, 730 N.W.2d 481, 488 (Mich. Ct. App. 2007). At that time, Kircher owned three properties relevant to this appeal: (1) the Thompson Building, (2) the Cross Street Property, and (3) the Perrin Street Property. In Washtenaw County Circuit Court, the City of Ypsilanti sued Kircher over one—the Thompson Building. It sought to compel him to "make certain repairs and abate certain building-code and fire-code violations" there. *Id.* The parties then agreed to a court order (1996 order) appointing Ypsilanti's building supervisor as receiver for that property to "bring[] the exterior of the building into compliance with the building ordinances and the Historic District ordinance." *Id.* (quoting the 1996 order). The order also appointed Kircher as the contractor to perform the specified repairs at his own cost. If Kircher flouted the order, the receiver could replace Kircher and "take certain other actions" to complete the required work. *Id.* And if he failed to pay, the parties agreed that "a lien shall be imposed upon the property . . . collectible through property taxes." *Id.* (quoting the 1996 order).

Kircher did not comply. So the circuit court entered a second and final order (1997 order). It directed Kircher "to 'begin work on the building to complete the repairs and improvements listed . . . within 120 days.'" *Id.* at 488–89 (quoting the 1997 order).

A couple of years later, Ypsilanti again sued Kircher to abate nuisances—this time on all three of the properties. (*See* R. 95, Ypsilanti's Resp., PageID 2002 (May 14, 2001 Cross Street Property Complaint), 2028 (April 11, 2002 Thompson Building Complaint), 2044 (July 30, 2001 Perrin Street Property Complaint).) It started with three complaints, again in Washtenaw County Circuit Court.

In its Thompson Building complaint, Ypsilanti alleged that Kircher had ignored the 1996 and 1997 orders. *Kircher*, 730 N.W.2d at 489. It asked the court to issue an order to show cause and requested immediate appointment of a receiver for the property. *Id.* And Ypsilanti argued all three properties violated the state Fire Prevention Code and local building and fire codes. *Id.* at 489 (Thompson Building), 494 (Cross Street Property); *see Ichesco v. Rankin*, No. 272905, 2008 WL 681856, at *1 (Mich. Ct. App. Mar. 13, 2008) (Perrin Street Property).

**B.**

The circuit court held show cause hearings for the Thompson Building and for the Cross Street Property.[1]

For the Thompson Building hearing, the court heard testimony from the parties' witnesses. Ypsilanti's fire marshal, Jon Ichesco, testified on the building's problems and how he reached his findings. For example, Ichesco discussed "problems with [that property's] roof, . . . and [problems with its] windowpanes falling into the street." *Ypsilanti Fire Marshal v. Kircher*, Nos. 242697, 242857, 2004 WL 895888, at *1 (Mich. Ct. App. Apr. 27, 2004). Kircher "offered only his own testimony about what he thought was required and what he did to repair the building." *Id.* He also asserted that he could not possibly have completed the repairs in the 1997 order "because he had not received the grant money" referenced in the 1996 order. *Id.*

---

[1] Kircher points out that the court held no evidentiary hearing before issuing the Thompson Building Order.

But he does not dispute (and in fact concedes) that the circuit court held a show cause hearing after Ypsilanti brought its three nuisance-abatement suits and before the court issued the Thompson Building Order. Instead, he explains that show cause hearings are not equivalent to evidentiary hearings. And the state courts confirmed Defendants' explanation that the court at least held show cause hearings before issuing its orders for both properties. *Kircher*, 2004 WL 895888, at *1–2.

The court disagreed with Kircher. It found Kircher disregarded the 1996 and the 1997 orders. It "specifically f[ou]nd [] the building [] in dangerous condition" and "a nuisance." *Id.* (quoting the trial court). So it entered the Thompson Building Order. That order appointed Robert Barnes as receiver for the property and required Barnes to "make the building economically viable[,]" *id.* (quoting the Thompson Building Order); it essentially authorized him to "complete all necessary repairs[,]" *Kircher*, 730 N.W.2d at 489. It required Barnes to "maintain detailed records of the costs expended [to] repair[]" that property and directed Barnes to bill Kircher monthly for those costs. *Id.* It also directed Kircher to "pay all billed costs within 30 days," and to pay Ypsilanti's attorney fees "incurred in conjunction with the enforcement and supervision of th[at] order." *Id.* And it gave the receiver "a lien on the property at the conclusion of the repairs for any costs Kircher had not paid." *Id.*

The circuit court entered its first order for the Cross Street Property after the show cause hearing for that property. That order enumerated 224 repair items. *Kircher*, 2004 WL 895888, at *2. The court also issued "an order to vacate the premises which also required a certificate of occupancy before further occupation and inspections." *Id.*

The parties later met for an evidentiary hearing where they spoke on the record. *Id.* Ypsilanti asserted that the parties agreed Kircher would make repairs "subject to a determination of workmanship by Harry Hutchinson, head of the city's building department." *Id.* It explained that the parties were trying to resolve the issues but that the parties would litigate anything unresolved. *Id.* Kircher also spoke on the record and "did not object" to Ypsilanti's testimony. *Id.*

"[B]ecause the parties entered a stipulated order[,]" the court did not hear further testimony. (R. 95, Ypsilanti's Resp., PageID 2005.) Instead, the court entered another order requiring Kircher

to make the repairs within ten days and permitting city officials to inspect the building twenty-one days after the order's entry. *Kircher*, 2004 WL 895888, at *3. It agreed to give Hutchinson authority to approve the workmanship of Kircher's repairs. *Id.* Parties then stipulated to the entry of one more order that required Kircher to make "several repairs . . . immediately to bring th[e] [Cross Street Property] into compliance." *Id.* (internal quotation marks omitted) (quoting the additional order).

But Kircher did not comply. *Id.* The parties again held a show cause hearing for the Cross Street Property where Ypsilanti moved the court to appoint a receiver to make the repairs. *Id.* Kircher responded. So the circuit court held another evidentiary hearing where it considered testimony from Hutchinson, Ichesco, and Kircher.[2] *Id.* Hutchinson explained that he complied with the order that permitted him to make "all determinations of workmanship" on repairs made at that property. *Id.* Since the court's entry of that order, Hutchinson had visited the property "and was not pleased with the workmanship of the repairs" he found. *Id.* Ichesco testified on the repairs listed in the complaint and later orders; he specified that "the condition of the chimney posed threats of collapse and carbon monoxide poisoning." *Id.* Kircher responded and explained "the repairs that he made[.]" *Id.* And he discussed his "occupancy problems." *Id.*

The court ruled in Ypsilanti's favor; it "entered an order giving the city the exclusive responsibility and right to make the [five specified] repairs listed in the order" (the Cross Street Property Order). *Id.*; *see Kircher*, 730 N.W.2d at 495. But the Cross Street Property Order did not appoint a receiver. Instead, it "permit[ted] the city to employ Barnes or other entities to accomplish this task." *Kircher*, 2004 WL 895888, at *6. That order also "directed Ypsilanti or its contractors to send Kircher regular invoices for the expense of all repairs[.]" *Kircher*, 730 N.W.2d

---

[2] The parties agree and consider this the "first evidentiary hearing in which testimony was taken regarding the Cross Street Property[.]" (R. 95, Ypsilanti's Resp., PageID 2007.)

at 495. "[I]n the event Kircher failed to pay, Ypsilanti would have a lien on the apartment building, which would be subject to foreclosure." *Id.* The order also made Kircher "liable for any necessary attorney fees and costs incurred by Ypsilanti or its contractors." *Id.*; *see also id.* at 498.

So Kircher appealed both orders. The Michigan Court of Appeals consolidated those appeals. *See Kircher*, 2004 WL 895888, at *1. But it took two years to render its decision. *Id.*

During those two years, Barnes and Ypsilanti kept themselves busy improving Kircher's property. The pair "had exclusive possession" of the Thompson Building and "were permitted to repair the property with unlimited authority." (R. 95, Ypsilanti's Resp., PageID 2032.) In that time, Ypsilanti also contracted with Barnes and his company (Barnes & Barnes) to make the Cross Street Property repairs. But Kircher failed to pay the invoices Barnes submitted for the Cross Street Property repairs. *See Kircher*, 730 N.W.2d at 495. So the trial court again held an evidentiary hearing. *Id.* After that, it entered another order that directed Kircher to pay those repair costs within 30 days. *Id.* That order also explained that Kircher's payment on the full amount would terminate Ypsilanti's right to occupy and repair the Cross Street Property; in that case, that property "would be fully returned to Kircher." *Id.* But in the event Kircher failed to make those repairs on time, the order gave Ypsilanti authority "to expend money to make further repairs necessary to bring the building into compliance with local building and fire ordinances." *Id.* Again Kircher failed to pay. *Id.* at 496.

In 2004, the Michigan Court of Appeals decided the consolidated appeals. It affirmed the circuit court's decision to issue its order appointing a receiver for the Thompson Building. But it objected to parts of the Thompson Building order. It found that the order gave the receiver too much authority because it allowed him to "spend and charge t[he] defendant unlimited amounts of money for unspecified repairs." *Kircher*, 2004 WL 895888, at *4. The order also improperly

6

allowed the receiver to make repairs "beyond removing the hazards of which plaintiffs originally complained." *Id.* So the court "reverse[d]" the part of that order that allowed the receiver to "make the building economically viable and functional." *Id.* (quoting the Thompson Building Order). The Cross Street Property Order, however, imposed "sufficient restraints" on Ypsilanti and on what the city could do to "bring th[at] property into compliance." *Id.* at *6 (quoting the Cross Street Property Order).

The appeals court remanded both orders to the circuit court. For the Thompson Building Order, the appeals court directed the trial court to "enter an order that more precisely defines the receiver's duties." *Id.* at *4. And it ordered the circuit court to review the amounts Barnes charged Kircher for the Cross Street Property work. *Id.* at *6. "In light of the harsh consequences of defendant's failure to pay, the [Cross Street Property] [O]rder must provide that charges to [Kircher] shall be reviewed by the trial court to determine whether they are appropriate and reasonable before [Kircher] is required to pay." *Id.*

A month later, the circuit court began its evidentiary hearings on remand. At those hearings, Kircher tried to raise, but the court refused to hear, any constitutional claims because the appeals court "didn't deal with it as a constitutional issue." (R. 95, Ypsilanti's Resp., PageID 2017–18 (quoting the evidentiary hearing transcript).)

Barnes testified on the Cross Street Property repairs. The five original repairs he made "related to the abatement of alleged Fire Prevention Code violations[.]" *Kircher*, 730 N.W.2d at 498. Barnes had also hoped and expected that he would "ultimately receive[] ownership of the building." *Id.* at 499. So he "moved forward" with more repairs to "bring the apartment building into compliance with [the] city ordinances and to make the building economically viable." *Id.* at 498–99. But he testified he never asked a court for permission to go beyond the five specified

7

repairs.[3] *Id.* at 499. He also conceded that Kircher "never received an opportunity to contest or object to any of the[] additional repairs and modifications." *Id.*

Kircher also testified on those repairs. He explained his inability to find financing to pay the costs he owed Barnes for the five initial repairs on that property. *Id.* He let the court know that he believed another contractor "could have [] performed" the five repairs "at a lower cost" than Barnes charged. *Id.*

During the Thompson Building remand hearings, the circuit court "expressed its opinion that the [evidentiary] hearing would 'satisfy' th[e] [appeals court's] remand instructions." *Id.* at 490. But Kircher's counsel argued otherwise. He explained that the appeals court had directed the circuit court to enter an order that more precisely tailored the receiver's duties to align with the original purpose of the receivership and the order. *Id.* The court also heard Barnes's testimony on the Thompson Building repairs.

At the end of the evidentiary hearings, the circuit court largely approved the fees Barnes charged for work done on both the Thompson Building and the Cross Street Property. *Id.* at 491, 499. But Kircher still could not pay. So the circuit court "entered a lien against the Thompson Building[.]" *Id.* at 491. Barnes then sued to foreclose the Thompson Building lien. Two years after Barnes filed that foreclosure complaint, the circuit court entered a judgment of foreclosure; it ordered the sheriff to sell that property. *Id.* at 491–92. The Thompson Building's successor receiver Stewart Beal—appointed on Ypsilanti and Barnes's joint motion—ultimately bought the Thompson Building at a 2006 sheriff's sale for $346,186.39. *Id.* at 492–93.

---

[3] The Cross Street Property Order did, however, explain that, in the case Kircher failed to make the payments within the time specified in the order, the city and its contractor could make "further repairs necessary to bring the building into compliance with local building and fire ordinances." *Supra*, at 6 (quoting *Kircher*, 730 N.W.2d at 495). And Kircher had failed to pay.

Barnes also filed a complaint to foreclose the judicial lien on the Cross Street Property and to determine interests in real property.[4] *Id.* at 496. Both Barnes and Kircher moved for summary disposition in the foreclosure proceedings. *Id.* at 497–98. Barnes asked the court to find Kircher failed to pay costs associated with the five repairs enumerated in the order for that property. Kircher counter-claimed and argued that "Barnes had exceeded his authority as Ypsilanti's contractor, and . . . [argued that Kircher] did not owe the amounts claimed by Barnes[.]" *Id.* at 498.

The circuit court ruled in Barnes's favor. It found Kircher owed Barnes money for the necessary repairs Barnes made on that property. *Id.* The trial court then entered a judgment of foreclosure on that property and "ordered the property sold." *Id.* at 499. And Barnes bought that property at the sheriff's sale for $244,535.09. *Id.* Kircher objected to the foreclosure judgment and the sheriff's sale because he believed "that statutorily prescribed procedures were not followed." *Id.* But the circuit court found that the sale "had been 'regular in all respects'" and entered an order confirming it.[5] *Id.* (quoting the trial court order).

Kircher then appealed a second time. On appeal, he argued that the circuit court failed to follow the appeals court's remand instructions. He also raised constitutional claims—takings and

---

[4] During that time, Ypsilanti and Barnes also jointly moved the circuit court and asked it to give them authority to reconfigure that property into a sorority or a fraternity house. The court refused. But Barnes was undeterred. He went ahead and applied to Ypsilanti for a "special use permit," requesting to use that property as a sorority or fraternity house. (R. 95, Ypsilanti's Resp., PageID 2013.) And Ypsilanti later approved Barnes's request for a special use permit to use the Cross Street Property as a sorority or fraternity house.

[5] The Cross Street Property foreclosure proceedings began before the state court decided the first appeal it consolidated. But the court entered the order resolving the parties' summary disposition motions and entered its foreclosure judgment for that property after the appeals court's decision. *Kircher*, 730 N.W.2d at 498–99 (explaining that the state appeals court decided the first consolidated appeal in April 2004 but the trial court resolved the summary disposition motions in May 2004 and entered the foreclosure judgment in February 2005).

procedural due process claims—based on Ypsilanti and the receivers' actions up until the appeal. *E.g.*, Brief for Kircher at 15, *Kircher*, 730 N.W.2d 481 (Nos. 260970, 260971), 2005 WL 5913373, at *12 (The "case involving the Thompson Building . . . is an outrage to the constitution . . . [i]t is nothing less than a taking . . . . [T]he longer it is permitted to go on, the greater is the liability of the taxpayers of Ypsilanti for taking damages."); *id.* (explaining that the Thompson Building proceedings amounted to "a denial of basic Due Process of Law"); *see also, e.g.*, Brief for Kircher at 24, *Kircher*, 730 N.W.2d 481 (Nos. 260972, 260973), 2006 WL 4940881, at *25 (arguing that the foreclosure on the Cross Street Property "is a taking" because "the city cannot take property under the guise of administering its building code" (emphasis omitted)); *id.* at 21–22, 2006 WL 4940881, at *22–23 (asking for a retrial on charges for the Cross Street Property repairs because the United States Supreme Court "has said:  The fundamental requisite of due process of law is the opportunity to be heard" (internal quotation mark omitted)).[6]

Ypsilanti and Barnes responded.  They argued that the circuit court's remand proceedings "satisfied" both "[d]ue process and the law[.]"  Brief for Ypsilanti at 19, *Kircher*, 730 N.W.2d 481 (Nos. 260970, 260971), 2005 WL 5913374, at *19; *see also* Brief for Barnes at 18, *Kircher*, 730 N.W.2d 481 (No. 260973), 2005 WL 5886853, at *18 (describing Kircher's arguments as presenting a "distorted view of what due process requires").  And "[t]here exists no fundamental right in our legal system to violate a municipality's codes and regulations with impunity[.]"  Brief for Barnes, *supra*, at 18, 2005 WL 5886853, at *18 (internal quotation marks omitted) (quoting *Banks v. City of Whitehall*, 344 F.3d 550, 554 (6th Cir. 2003)).  So Kircher's argument that the charges amounted to "an unconstitutional taking is absurd."  *Id.* at 20–21, 2005 WL 5886853, at

---

[6] Westlaw dated this brief July 22, 2006—a mistake likely resulting from the smudged court stamp on the original document.  But it's clear from the Michigan appeals court's docket and the original PDF's signature page that this is Kircher's July 2005 brief in Nos. 260972, 260973.

*20–21 (explaining that "[t]here was no taking" because Kircher "has not been deprived of his property" and he "only has to pay the costs of the repairs made to abate the nuisance that [Kircher] created").

In a 2007 decision, the Michigan Court of Appeals affirmed parts of the circuit court's remand decisions on the two properties. It affirmed Ichesco's authority to bring the nuisance-abatement action for both properties. *Kircher*, 730 N.W.2d at 501–02 (Thompson Building); *id.* at 511 (Cross Street Property). And it affirmed the court's decision to "authoriz[e] Ypsilanti to take possession of, and make necessary repairs to, the apartment building" at the Cross Street Property. *Id.* at 517.

But it found the circuit court failed to follow its remand instructions for both orders. And it found that error was not harmless. It explained that "[v]irtually all individual repairs and renovations to the [Cross Street Property] were approved after the fact[.]" *Id.* at 513. So Kircher "received no meaningful opportunity to contest any of th[ose] costs" before Barnes incurred them. *Id.* And he did not get the chance to "separately contest each cost" and the reasonableness of the Cross Street Property repairs until after Barnes made them. *Id.*

The circuit court's evidentiary hearings also failed to cure the Thompson Building Order's defects. Those after-the-fact hearings gave Kircher "no meaningful opportunity to contest the individual costs incurred . . . or to offer evidence in response to the individual proposed projects" at the property. *Id.* at 505. And the circuit court did not follow the appeals court's instruction to "amend[] its original [Thompson Building] order or issue[] a new order to limit or otherwise narrow the scope of the receiver's authority." *Id.* at 504. "To make matters worse," the circuit court issued an order appointing Beal as successor receiver on remand and allowed Beal "to merely continue in the shoes of the original receiver and to carry on virtually unlimited repairs and

renovations to the Thompson Building without first seeking judicial permission or approval." *Id.* at 504–05.

To remedy the circuit court's errors, the appeals court vacated the foreclosure judgments for both properties and invalidated those foreclosure proceedings "to the extent that they involved the collection of expenses incurred solely under the municipal building and fire codes." *Id.* at 517. But "to the extent that the[] [costs] involved the lien imposed for expenses properly incurred under the state Fire Prevention Code[,]" the court "affirm[ed] the foreclosure proceedings and judgment[s] of foreclosure[.]" *Id.*; *see also id.* at 507, 513. The court also found that "there remained no further need for a receiver" once Beal bought the Thompson Building. *Id.* at 509. So it ordered the circuit court to "enter an order terminating the receivership" as of the date of the Thompson Building sheriff's sale. *Id.* at 510. As the record owner, Beal alone remained responsible for almost all costs incurred beyond that date. *Id.*

For a second time, the appeals court remanded to the circuit court with detailed instructions.[7] For both properties, it ordered the circuit court to determine the purposes for each expense—either to remedy state Fire Prevention Code violations or to abate violations of Ypsilanti building and fire codes. *Id.* at 517–18. For those falling in the first category, the court "shall include th[o]se expenses in the amount of the foreclosed lien." *Id.*; *see also id.* at 507, 513. But it "shall exclude the[] expenses" in the latter category "from the lien amount[s] as surplus." *Id.* at

---

[7] We interpret the state appeals court's remand instructions to mean that it mistakenly referred to the same docket numbers twice for two sets of instructions. For the court's remand instructions on both properties, it references the Thompson Building docket numbers—"Docket Nos. 260970 and 260971." *Kircher*, 730 N.W.2d at 517. But in its second set of remand instructions, the court references "the apartment building[,]" its shorthand for the Cross Street Property. *Id.* The first set of instructions also referenced the "order['s] appoint[ment] [of] the receiver." *Id.* The Cross Street Property Order appointed no receiver. *See supra*, at 5. So we treat the second remand instructions—the one that references "the apartment building"—as remand instructions for the Cross Street Property Order. The first set of remand instructions applies to the Thompson Building.

517–18; *see also id.* at 507, 513. "All costs properly incurred to abate violations" in the latter category "shall be paid out of this surplus, and any remainder left after payment of these expenses shall be disbursed to Kircher." *Id.* at 517–18. And "[i]n light of [the court's] resolution of" the consolidated appeals, the state appeals court "decline[d] to address the constitutional issues raised by Kircher[.]" *Id.* at 516. But in the footnote immediately following that refusal, the appeals court addressed Kircher's takings argument. *Id.* at 516 n.22.

The court first recounted Kircher's takings argument. *Id.* (explaining that Kircher relies on *County of Wayne v. Hathcock*, 684 N.W.2d 765 (Mich. 2004) to "suggest[] that his properties have been taken by Ypsilanti without just compensation"). It "assum[ed]" that Kircher "could []demonstrate[]" the "requisite state action[.]" *Id.* But a state "has not 'taken' anything when it asserts its power to enjoin [a] nuisance-like activity" because "no individual has the right to use his or her property . . . to create a nuisance[.]" *Id.* (first alteration in original) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491 n.20 (1987)). And "courts have consistently held that a[]state need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance." *Id.* (alterations in original omitted) (quoting *DeBenedictis*, 480 U.S. at 492 n.22). The state court also found that "Ypsilanti was exercising its legitimate police power to abate the alleged nuisances on Kircher's property[.]" *Id.* So the court "disagree[d] with Kircher's contention . . . [and concluded that] no unconstitutional taking occurred." *Id.*

On remand the circuit court again held evidentiary hearings for costs imposed on both properties. It upheld the Cross Street Property liens for $211,159.27. And it upheld all Thompson Building charges made by the receiver. Kircher appealed the circuit court's decisions three more times. The first two of those appeals ended with the Michigan Court of Appeals remanding to the

circuit court "for more clarification regarding the liens[.]" (R. 95, Ypsilanti's Resp., PageID 2044.) The state appeals court denied the last appeal.

## C.

While the state courts heard the Cross Street Property and the Thompson Building proceedings, Kircher simultaneously litigated Ypsilanti's Perrin Street Property complaint. After Ypsilanti filed its nuisance-abatement suit for the Perrin Street Property, the circuit court held a show cause hearing with testimony.[8] *Kircher v. City of Ypsilanti*, No. 04-72449, 2018 WL 1811468, at *10 (E.D. Mich. Apr. 17, 2018). And the circuit court entered a consent order "agreed to" by both parties. *Rankin*, 2008 WL 681856, at *3. That order directed "[Kircher] and the receiver [] to formulate a list of the violations requiring repair" and "tasked" both "with executing the repairs." *Id.* And the court appointed Barnes as successor receiver of the Perrin Street Property. *Kircher v. City of Ypsilanti*, 458 F. Supp. 2d 439, 443–44, 445 n.7 (E.D. Mich. 2006).

The circuit court eventually dismissed the Perrin Street Property proceedings without prejudice for "lack of progress[.]" *Rankin*, 2008 WL 681856, at *1. Kircher appealed. But the Michigan Court of Appeals dismissed the appeal because it lacked jurisdiction to review a circuit court's order dismissing a case for lack of progress without prejudice. *Id.* A few years later, Kircher moved the circuit court to reinstate the case for a final adjudication so that he could appeal the decision. *Id.* The court refused. *Id.* And Kircher appealed again.

On appeal, the Michigan Court of Appeals reviewed the circuit court's decision on Kircher's motion to reinstate a claim. *Id.* Kircher made four arguments for his position and against

---

[8] Kircher explained that the court never held an evidentiary hearing before issuing the Perrin Street Property Order. Defendants do not dispute that the court never held an evidentiary hearing. But they explained that the court *did* hold a show cause hearing "where testimony was taken." (R. 95, Ypsilanti's Resp., PageID 2045.) Kircher does not dispute that fact and instead explained that he distinguishes between evidentiary and show cause hearings.

the Perrin Street Property Order: a standing argument, two takings arguments, and a claim that invoked the Fifth and Fourteenth Amendments.

The Michigan Court of Appeals refused all four arguments. First, it rejected Kircher's standing argument. Kircher claimed Ypsilanti lacked standing to bring the nuisance-abatement suits. To support his position, Kircher argued that Ypsilanti could not sue because Ichesco had no authority as the city fire marshal. *Id.* at *2. The court explained that it "ha[d] already addressed and decided th[at] issue" with "exactly the same parties" in the Cross Street Property and Thompson Building appeal. *Id.* It affirmed its earlier decision because Kircher did not bring new evidence justifying a different outcome. *Id.*

Second, the appeals court addressed Kircher's first takings argument. Kircher claimed that appointing a receiver "constituted an unconstitutional taking because other, less drastic remedies were available and appropriate." *Id.* at *2. Only "extreme cases[,]" in Kircher's mind, justified receiverships. *Id.* (describing receiverships as "extraordinary remed[ies]"). But Kircher cited no supporting evidence for that position. He did not explain the other remedies more appropriate for his circumstances. And he did not provide the court with "any evidence from the record demonstrating that the successor receiver . . . did not act" in a way that "protect[ed] and benefit[ted] both parties equally." *Id.* at *3 (quoting *Kircher*, 730 N.W.2d at 503). Given Kircher's failure to support his assertion, the court "consider[ed] th[e] issue abandoned on appeal." *Id.*

In the same argument, Kircher also alleged that the circuit court erroneously approved the Perrin Property charges submitted by the receiver. *Id.* Unlike the Thompson Building Order, the consent order did not allow the receiver to make the property "economically viable" or to make "unspecified upgrades" for "cosmetic purposes" to the Perrin Property. *Id.* (contrasting *Kircher*, 730 N.W.2d at 504). It did not "fail[] to provide for proper judicial supervision and oversight of

15

the receiver's activities and expenditures[.]" *Id.* (quoting *Kircher*, 730 N.W.2d at 504). Instead, the parties' "original consent order" for the Perrin Property required Kircher and the receiver to "formulate a list of the violations requiring repair" and "tasked [them] with executing the repairs." *Id.* Kircher, however, complained that the receiver's court-approved compensation—"25 percent of the costs of the repairs"—"disincentiv[ized] [] the receiver to keep the costs of the repairs down." *Id.* The court conceded that Kircher's arguments "may appeal to logic" but he did not provide any evidence to how the receiver spent "extraordinary or excessive" amounts for the repairs. *Id.* So "[Kircher]'s argument fail[ed]." *Id.*

Third, the appeals court addressed Kircher's second takings argument. Kircher explained that the foreclosure on the Perrin Property amounted to an unconstitutional taking "because pertinent statutes did not authorize the lien." *Id.* at *4. But—for a couple of reasons—that argument failed as well. The circuit court's order appointing a successor receiver "entitled" "the Receiver . . . to legal or equitable relief" including foreclosure of the Perrin Property lien if Kircher failed to pay for the repairs on time. *Id.* (quoting the trial court order). The state statutes also "provide[d] remedies"—including imposing and enforcing liens—"in situations where a defendant has not complied with a[] [court] order . . . or has allowed an unreasonable amount of time to pass before making court-ordered repairs on the property." *Id.* (citing Mich. Comp. Laws §§ 29.14 and 29.16). And Kircher "d[id] not assert that he complied with the trial court's orders by making the required repairs in a timely fashion, or at all." *Id.* Rather he urged that court to find the lien invalid "because the case was not properly governed by the Fire Prevention Code due to plaintiffs' lack of standing." *Id.* The appeals court, however, already found Defendants had standing to sue.

Last, the appeals court addressed Kircher's argument that "[a]ll plaintiffs are state actors and thus liable for violations of the 5th and 14th Amendments[.]" *Id.* (first alteration in original).

To support that claim, Kircher "provide[d] only two brief references to federal case law." *Id.* "Because [Kircher] neither explain[ed] his position nor ma[de] an argument in enough detail for th[e] Court to review it, [the state court] consider[ed] th[e] issue abandoned on appeal." *Id.*

Kircher asked the Michigan Supreme Court to review the state appeals court's decision. It refused. *Ichesco v. Kircher*, 755 N.W.2d 178 (Mich. 2008). It also refused Kircher's motion for reconsideration. *Ichesco v. Kircher*, 759 N.W.2d 390 (Mich. 2009).

## II.

While the parties litigated in state court, Kircher sued in the United States District Court for the Eastern District of Michigan. He named seven defendants. Five remain in the appeal before us: (1) the City of Ypsilanti, (2) Cheryl Farmer, Mayor of Ypsilanti, (3) Charles Boulard, Building Inspector of Ypsilanti, (4) Jon Ichesco, Fire Marshall of Ypsilanti, and (5) Robert Barnes, receiver.[9] *Kircher*, 2018 WL 1811468, at \*1. He alleged that Defendants violated his constitutional rights in their actions related to the Cross Street Property. A couple of days later, Kircher filed an amended complaint in the federal suit. His amended complaint included constitutional claims related to all three properties. Kircher then filed *England* reservations in each of the City's nuisance-abatement cases and foreclosure cases in state court.[10] And the federal

---

[9] Kircher also named two judges in his original complaint. But the district court granted the judges' early Motion to Dismiss on judicial immunity and other grounds. They no longer remain in this case. *See Kircher*, 2018 WL 1811468, at \*1.

[10] "[A] party [that] freely and without reservation submits his federal claims for decision by the state courts, litigates them there, and has them decided there . . . has elected to forego his right to return to the District Court." *England v. Louisiana State Bd. of Med. Examiners*, 375 U.S. 411, 419 (1964). But that "does not mean that a party must litigate his federal claims in the state courts[.]" *Id.* at 420. Instead, he may make an *England* reservation by "inform[ing] the state courts that he is exposing his federal claims there . . . [but] that he intends, should the state courts hold against him on the question of state law, to return to the District Court for disposition of his federal contentions." *Id.* at 421. Doing so, he may reserve his ability to return to federal court and

district court stayed Kircher's federal litigation under the *Younger* abstention doctrine. *Kircher*, 458 F. Supp. 2d at 450–52.

After the state supreme court rejected Kircher's appeal, the federal court lifted its stay in May 2017. Kircher moved for leave to amend his complaint for the second time and for discovery. He sought to add five new claims—a substantive due process claim, three takings claims, and a procedural due process claim. In response, Defendants moved to dismiss Kircher's claims under Fed. R. Civ. P. 12(b)(1) and (6). After a hearing on the parties' motions, the district court denied Kircher's motion and granted defendant's motion to dismiss. *Kircher*, 2018 WL 1811468, at *1. It held that both res judicata and collateral estoppel barred the claims Kircher wanted to raise in his second amended complaint. *Id.* at *12–14. That required it to dismiss the case. And it found Kircher's *England* reservations failed. *Id.* at *14–16.

Kircher asked the district court to alter or amend the district court's judgment and deny Defendants' motion to dismiss. In the alternative, he asked the court to stay the case pending the Supreme Court's decision in *Knick v. Township of Scott*, 139 S. Ct. 2162 (2019). But the district court refused.

Kircher appealed.

---

litigate his federal claims. The Supreme Court first discussed this concept in the context of federal courts abstaining under *R.R. Comm'n of Texas v. Pullman Co.*, 312 U.S. 496 (1941).

But we need not discuss the effect, if any, of Kircher's attempt to make *England* reservations below because he does not argue before us that the district court inappropriately found those attempts failed. *See, e.g.*, *Pagan v. Fruchey*, 492 F.3d 766, 769 n.1 (6th Cir. 2007) (en banc).

### III.

On appeal, Kircher raises two arguments. He claims that the district court improperly imposed the stay under *Younger* abstention. He also urges us to find that the district court erroneously determined that Michigan res judicata and collateral estoppel barred his federal claims. So he asks us to find that the lower court should not have granted Defendants' motion to dismiss and should have granted his second motion to amend his complaint.

### A.

Kircher's *Younger* abstention claim is moot. "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Aaron v. O'Connor*, 914 F.3d 1010, 1015 (6th Cir. 2019) (alteration in original) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). But "jurisdiction in this court is not necessarily defeated simply because the order under review has expired." *In re Commerce Oil Co.*, 847 F.2d 291, 293 (6th Cir. 1988). "If the underlying dispute between the parties is one 'capable of repetition, yet evading review[,]' we may still hear the case although it is technically moot." *Id.* (citing *Davis*, 440 U.S. at 631). This "capable of repetition doctrine applies if the challenged action is too short in duration" for parties to "fully litigate[] prior to its cessation or expiration and there is a reasonable expectation that the same complaining party would be subject to the same action again." *Id.* (citing *Weinstein v. Bradford*, 423 U.S. 147, 148 (1975); then citing *United States v. City of Detroit*, 720 F.2d 443, 448–49 (6th Cir. 1983)).

Kircher's *Younger* abstention claim no longer presents a "live" controversy. The district court already imposed the stay *and* provided the "procedural relief of lifting the stay." *Id.* at 294. And the "capable of repetition doctrine" does not apply here. *See, e.g.*, *id.* at 293–94 (evaluating a stay after the lower court lifted the stay because the affected party would "continually face[]" the

same question and the stay automatically lifted after 45 days so "the state will never be able to appeal the [stay's] substance"). So we need not address that claim.

**B.**

Kircher raises various reasons that he believes support his position that Michigan preclusion law does not bar the federal claims in his second amended complaint. We disagree.

A party may generally amend his pleadings "once as a matter of course[.]" Fed. R. Civ. P. 15(a)(1). Other than the first time, a party may amend the complaint "only with the opposing party's written consent or the court's leave" and a "court should freely give leave when justice so requires." *Id.* 15(a)(2). A court should deny a motion to amend a complaint "if the amendment is brought in bad faith, for dilatory purposes, results in undue delay or prejudice to the opposing party, or would be futile." *Colvin v. Caruso*, 605 F.3d 282, 294 (6th Cir. 2010) (quoting *Crawford v. Roane*, 53 F.3d 750, 753 (6th Cir. 1995)). An amendment to a complaint is futile "when the proposed amendment would not permit the complaint to survive a motion to dismiss." *Miller v. Calhoun County*, 408 F.3d 803, 817 (6th Cir. 2005). And a court should grant a motion to dismiss if the party "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6).

We usually evaluate a district court's denial of a motion to amend a complaint for an abuse of discretion. *Colvin*, 605 F.3d at 294. But the district court rejected Kircher's motion to amend because it found Michigan law precluded those new claims and so those claims could not withstand a motion to dismiss. *Kircher*, 2018 WL 1811468, at *1, *12–14. For those reasons, it granted defendants' motion to dismiss. *Id.* at *1. In circumstances like Kircher's, we review the district court's decision de novo. *Colvin*, 605 F.3d at 294.

This court reviews de novo a district court's decision to grant a motion to dismiss "pursuant to the same standards that should have been applied in the district court." *Fritz v. Charter*

*Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010); *see* Fed. R. Civ. P. 12(b)(6). For that evaluation, this court "accept[s] as true all non-conclusory allegations in the complaint and determine[s] whether [the allegations] state a plausible claim for relief." *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1005 (6th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

And "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). So to evaluate the district court's decision granting Defendants' motion to dismiss, we must determine the preclusive effect of the state courts' judgments on this case. We review a district court's decision to apply either res judicata or collateral estoppel de novo. *Buck v. Thomas M. Cooley Law Sch.*, 597 F.3d 812, 816 (6th Cir. 2010); *Knox Cty. Educ. Ass'n v. Knox Cty. Bd. of Educ.*, 158 F.3d 361, 371 (6th Cir. 1998).

Under Michigan law, res judicata precludes a later claim if "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first[.]" *W.J. O'Neil Co. v. Shepley, Bulfinch, Richardson & Abbott, Inc.*, 765 F.3d 625, 630 (6th Cir. 2014) (quoting *Adair v. State*, 680 N.W.2d 386, 396 (Mich. 2004)); *Schwartz v. City of Flint*, 466 N.W.2d 357, 359 (Mich. Ct. App. 1991) (explaining that Michigan res judicata bars "claims actually litigated in a prior action and those claims arising out of the same transaction which plaintiff could have brought, but did not" (citing *Gose v. Monroe Auto Equip. Co.*, 294 N.W.2d 165 (Mich. 1980))).

Michigan does not have a categorical compulsory counterclaim rule. But Michigan res judicata can work as a compulsory counterclaim rule. Michigan's "doctrine of res judicata will []

operate to bar a subsequent claim that could have been raised as a counterclaim in the first action." *Stanton v. Auto Owners Ins. Co.*, Nos. 327007, 327644, 2016 WL 6269614, at *5 (Mich. Ct. App. Oct. 25, 2016); *see* 2 Ronald S. Longhofer, Michigan Court Rules Practice § 2203.1 (7th ed. 2020). So "a counterclaim arising out of the same transaction or occurrence as the principal claim must be joined in one action." *Stanton*, 2016 WL 6269614, at *5 (quoting *Salem Indus., Inc. v. Mooney Process Equip. Co.*, 437 N.W.2d 641, 642 (Mich. Ct. App. 1988)). Otherwise, the "failure to assert a counterclaim stemming from the same issues or subject matter in a prior suit will estop a defendant from afterwards maintaining a separate action on that counterclaim against the plaintiff in the prior suit." *Id.* (quoting *Sahn v. Brisson's Estate*, 204 N.W.2d 692, 694–95 (Mich. Ct. App. 1972)).

Michigan law will not, however, bar a party from later bringing a claim that the court in the first litigation refused to hear. *Allen Park Retirees Ass'n v. City of Allen Park*, -- N.W.2d --, 2019 WL 3806250, at *6–7 (Mich. Ct. App. Aug. 13, 2019) (finding res judicata did not bar plaintiffs from raising state constitutional claims in a later proceeding because the appeals court in the earlier proceeding "expressly declined to decide" those claims and so they "w[ere] not decided on the merits"). And Michigan law will not bar a party from later bringing a claim that the court in the first litigation did not decide but only discussed in dicta. *See Taylor Commons v. City of Taylor*, No. 206653, 1999 WL 33444318, at *1–2 (Mich. Ct. App. May 21, 1999) (*Taylor II*) (finding res judicata did not bar the party from raising constitutional claims that the appeals court in the earlier proceeding discussed in dicta but did not resolve).

The parties do not dispute whether the proceedings here meet the first two Michigan res judicata elements. All prior actions were decided on the merits. *See Kircher*, 2018 WL 1811468, at *13. And the proceedings involve the same parties or their privies. *Id.* They dispute whether

the federal claims Kircher wants to raise in his second amended complaint "w[ere], or could have been, resolved in the first[.]" *W.J. O'Neil*, 765 F.3d at 630 (quoting *Adair*, 680 N.W.2d at 396).

*Substantive Due Process.* In Kircher's second amended complaint, Kircher presented a substantive due process claim. He contended Defendants violated his substantive due process rights because their actions violated the Fifth Amendment's prohibition against "deliberate and arbitrary use of government power." (R. 84-2, Second Am. Compl., PageID 1189.) Defendants' actions "were arbitrary and unreasonable, and either failed to advance a legitimate government interest or were an unreasonable means of advancing a legitimate government interest." (*Id.* at 1189–90.) He asked for damages "in excess of $75,000[.]" (*Id.* at 1190.)

Although Kircher argues that the state courts refused to address the takings claims he raised before them *and* that they were not ripe, for his due process claims (substantive and procedural), Kircher argues *only* that those claims were not ripe at the time of the state court's decisions. In his general discussion on the state court's refusal to resolve certain claims, Kircher mentions his due process claims only once—to support his explanation that "the district court adhered to its prior ruling that Kircher's *inverse condemnation* claims could have been brought in the state court actions." (Appellant's Br. at 41 (emphasis added and omitted).) And he devotes that entire argument to whether the district court "erred [when it] f[ound] that Kircher 'could have' brought his *takings* claim" in state court "because . . . the state court refused to hear it." (*Id.* (emphasis added and omitted).) So we consider any similar argument Kircher could raise for his due process claims—that the state court simply refused to resolve Kircher's due process claims—waived. *See United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008).

For his substantive due process claim, Kircher specifically alleges the claim "w[as] not ripe when the City filed its nuisance abatement case[.]" (Appellant's Br. at 45.) He supports this

position with a FOIA response that he received in 2008. That FOIA response allegedly informed Kircher that "the City's fire inspector[, Ichesco,] falsely asserted that . . . the state fire marshal" "had [] delegated [Ichesco] authority" to begin nuisance-abatement proceedings. (*Id.*) So even if the state court let Kircher raise his substantive due process claim, he could not in those proceedings.

We are not convinced. Ichesco never asserted the state fire marshal delegated to him authority to begin nuisance-abatement proceedings. In fact, in Ichesco's 2001 affidavit (the one that Kircher argues was falsified), he explained that "the state Fire Marshal's office . . . said that *they were not delegating their authority to me*[.]" (R. 91-13, Ichesco Aff., PageID 1835–36 (emphasis added).) Ichesco also explained the office acknowledged his "right to do all other inspections not done by the State Fire Marshal's office" because Ichesco "carr[ied] out [his] enforcement activities pursuant to MCL 29.2(B)[.]" (*Id.* at 1836.) So Kircher's allegation—that the 2008 FOIA response revealed that the state Fire Marshal never delegated authority to Ichesco—does not raise new facts.

And, importantly, the state appeals court did address, several times and in connection with all three properties, whether Ichesco could act given that affidavit, and whether he acted reasonably within that authority. Each time, the court found in Ichesco's favor. *Ypsilanti Fire Marshal v. Kircher*, Nos. 300242, 300243, 300244, 300245, 2011 WL 6187067, at *2–3 (Mich. Ct. App. Dec. 13, 2011); *Rankin*, 2008 WL 681856, at *2 (Perrin Street Property); *Kircher*, 730 N.W.2d at 500–01 (Thompson Building), 511 (Cross Street Property).

Kircher's substantive due process claim relies only on factual allegations available before and considered by the state appeals court's decisions. So Kircher's substantive due process claim

was ripe, and he could have raised it before the state appeals court. Michigan law precludes him from raising that claim now.

*Takings.* In Kircher's second amended complaint, Kircher sought just compensation from Defendants for three inverse condemnation claims—at least $75,000 under 42 U.S.C. § 1983 for each claim. For all three, Kircher argued that "Defendants, under color of law, deprived [Kircher] [] use and ownership of his Property in order to further and promote Defendants' own plans . . . and to facilitate the transfer of the [properties] to another owner chosen by Defendants." (R. 84-2, Second Am. Compl., PageID 1185–88.) They interfered so greatly with Kircher's properties, Kircher alleged, they "t[oo]k" his properties and did so "without just compensation." (*Id.*)

Kircher argues that the state courts refused to hear and did not decide takings claims he raised during the state proceedings. He also claims state courts could not have heard his takings claims because they were not ripe when Defendants filed their nuisance-abatement suits. So he contends that Michigan law does not bar him from bringing the three takings claims in his second amended complaint in federal court. We disagree.

In his second amended complaint, Kircher raised no factual allegations unknown when the state appeals court reviewed the Perrin Street Property Order. Any takings claims Kircher had in connection with the Perrin Street Property and raised in his second amended complaint were ripe when the state appeals court reviewed that order. And in that decision, the state appeals court reviewed and decided the takings claims Kircher raised before it. *Supra*, at 15–16. So the state court either did or could have resolved those claims. And Michigan res judicata bars Kircher from raising them now.

The state appeals court also resolved or could have resolved Kircher's takings claims in connection with the Thompson Building and the Cross Street Property. That court resolved

multiple claims from Kircher in connection with those two properties in its 2007 decision. And Kircher alleged no facts unknown at that time in his second amended complaint. So any takings claims based on those facts were ripe at the time of that appeal. And Kircher in fact raised multiple such claims. We must determine whether the state court could and did resolve those claims.

True, the circuit court at first refused to address Kircher's takings claims in connection with those two properties. Undeterred, Kircher raised those claims again on appeal. So both parties litigated those takings claims before the state appeals court. *Supra*, at 9–11. And the Michigan Court of Appeals could properly decide them despite Michigan's usual rule that precludes parties from raising claims for the first time on appeal. *See People v. Heim*, 522 N.W.2d 675, 676 (Mich. Ct. App. 1994) (agreeing to review a claim for the first time on appeal as an exception to the usual rule "because [the claim] involves an important constitutional question").

Kircher, however, argues that the state appeals court did not resolve those takings claims because it refused to do so. To support his position, Kircher quotes a statement in the state appeals court's decision: "In light of our resolution of these consolidated appeals, we decline to address the constitutional issues raised by Kircher in these cases." *Kircher*, 730 N.W.2d at 516.

If the state court had stopped there, we might agree with Kircher. But that court continued. In a footnote appended to the language Kircher quotes, the court decided the takings question for those two properties and found Kircher's claims meritless. *See id.* at 516 n.22. Kircher, however, characterizes the footnote as dicta. We disagree.

Recall that Kircher raised both procedural due process and takings claims before the appeals court. That fact explains the dissonance between the appeals court's refusal to address constitutional issues and its footnote deciding Kircher's takings claims. The appeals court's "resolution of the[] consolidated appeals"—finding flaws in the circuit court's procedures on

remand—made any resolution of Kircher's procedural due process claims unnecessary. *Id.* at 516. So the appeals court's refusal to resolve the procedural due process claims "[*i*]*n light of*" its resolution on other grounds makes sense. *Id.* (emphasis added); *see also, e.g.*, *Gent v. Pride Ambulance Co.*, No. 252912, 2006 WL 66420, at *1 (Mich. Ct. App. Jan. 12, 2006) (per curiam) (explaining that Michigan appeals courts "generally must examine alternative, nonconstitutional grounds that might obviate the necessity of deciding [the constitutional questions]" before resolving constitutional claims (quoting *VandenBerg v. VandenBerg*, 586 N.W.2d 570, 571 (Mich. Ct. App. 1998))); *People v. Rutledge*, 645 N.W.2d 333, 335–36 (Mich. Ct. App. 2002) (resolving a case on non-constitutional grounds *even when* the parties only raised constitutional issues on appeal); *Taylor Commons v. City of Taylor*, No. 182833, 1996 WL 33324115, at *2 (Mich. Ct. App. July 9, 1996) (per curiam) (*Taylor I*) (refusing to address the constitutional issue where the court "c[ould] [] decide[] [the case] on alternative grounds" despite the fact that the state court "may review constitutional issues for the first time on appeal"). But the appeals court's determination that the lower court failed to follow remand instructions did not affect Kircher's takings claims because the court's footnote is the *only* mention of Kircher's takings claims in the state appeals court's decision. Accordingly, the court's "resolution" of the appeal did not make the court's resolution of Kircher's takings claims superfluous.

In fact, the appeals court's resolution of one constitutional question and not another makes perfect sense when viewed in the context of the court's resolution of the appeal. As part of the case's resolution, the appeals court vacated the repair charges already imposed and directed the trial court to reconsider the charges before requiring Kircher to pay. But the trial court permitted the nuisance-abatement suit's initiation and the consequences of that suit—the existence of repair charges, the foreclosure judgments, and sheriff sales—to stand untouched. *Supra*, at 11–13

27

(affirming Ichesco's authority to bring the nuisance-abatement action for both properties, vacating the foreclosure judgments and foreclosure proceedings only "*to the extent* that they involved" certain repair charges, and instructing the trial court to deduct repair charges for Fire Prevention Code violations or to abate violations of Ypsilanti building and fire codes from the sale proceeds (emphasis added) (quoting *Kircher*, 730 N.W.2d at 517)). So the appeals court's resolution of one constitutional question but not another mirrored its remand instructions: It logically resolved the constitutional question (whether the nuisance-abatement suit amounted to a taking) for the actions it permitted on remand (the suit and its consequences). And it logically refused to resolve any constitutional questions, under either a takings or due process theory, for the actions it vacated and disallowed on remand (the previously-imposed charges and procedures used to impose them).

Later Michigan Court of Appeals decisions also confirm our understanding of that footnote. *See, e.g.*, *Ypsilanti Fire Marshall v. Kircher*, No. 281742, 2009 WL 1607602, at *2 (Mich. Ct. App. June 9, 2009) (quoting footnote 22 to reject a takings claim in a decision involving another one of Kircher's properties); *Ypsilanti Charter Township. v. Kircher*, 761 N.W.2d 761, 775–76 (Mich. Ct. App. 2008) (citing footnote 22 to reject a takings claim in a decision involving another one of Kircher's properties); *Wayne Cty. Exec. v. Aggor*, No. 266183, 2007 WL 2067936, at *2 (Mich. Ct. App. July 19, 2007) ("[C]ourts have consistently held that a[]state need not provide compensation when it diminishes or destroys the value of property by stopping illegal activity or abating a public nuisance." (alteration in original omitted) (emphasis added) (quoting *Kircher*, 730 N.W.2d at 516 n.22)). That Michigan later treated that footnote as a holding undermines Kircher's dicta argument.

And Kircher's argument otherwise does not convince us. He cites only *Taylor II* for his position. But the footnote's language does not mirror the dicta in *Taylor II*. There, the first court

found the lower court had no jurisdiction to decide a constitutional issue and resolved the case on alternative grounds. *Taylor I*, 1996 WL 33324115, at \*2. The *Taylor I* court explained, however, that "[*e*]*ven if* th[e] Court were to address petitioner's argument, [the court] *would* conclude that the act is constitutional." *Id.* (emphasis added). Here, the state appeals court did not qualify its resolution of Kircher's takings claims; in no uncertain terms, it found that "no unconstitutional taking occurred." *Kircher*, 730 N.W.2d at 516 n.22.

Thus, we find that the state court resolved or could have resolved Kircher's takings claims arising from all three properties. Michigan res judicata precludes him from litigating those claims now.

*Procedural Due Process.* Because Kircher abandoned any argument on whether the state appeals court refused to resolve Kircher's procedural due process claims, we do not resolve that question.[11] *Supra*, at 23.

_____

[11] Had Kircher made those arguments on appeal, however, Kircher very likely could have avoided the effects of Michigan preclusion law on those claims. *Supra*, at 26–28. Even so, Kircher has likely failed to make out a successful procedural due process claim. "At its essence, due process can be summarized as 'the requirement that a person . . . be given notice of the case against him and [an] opportunity to meet it.'" *Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015) (alterations in original) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 348–49 (1976)). And that's exactly what Defendants and the state courts provided him.

Kircher received notice—starting as early as over twenty years ago—that Michigan law required him to make repairs on his properties to abate nuisances. The court also held multiple hearings where the court heard parties' testimony *before* resolving grievances in connection with the nuisance-abatement proceedings, *before* Defendants took over the repairs, and *before* Defendants foreclosed on Kircher's properties. In fact, before Defendants took over repairing Kircher's properties, they and the circuit court gave him opportunity after opportunity to make the required repairs on his own. *Supra*, at 2, 4–5.

But time and time again, Kircher failed to do so. Only then and after holding hearings did Michigan courts allow Defendants to personally step in—to repair the properties and charge Kircher for those repairs rather than wait for Kircher to repair them. *Supra*, at 4–6. And while the court gave Defendants authority to repair Kircher's properties, on at least one of the properties, the court simultaneously gave Kircher a chance to terminate that authority to repair his properties.

But he does argue that his procedural due process claims were not ripe during the state litigation. He neither supports that assertion with legal authority nor offers supporting evidence from the record. So we consider that argument abandoned. *See, e.g.*, *Castelvetere v. Messer*, 611 F. App'x 250, 255 (6th Cir. 2015) (finding appellant "abandoned th[e] issue" because he "fail[ed] to cite a single authority [to] support" his "assert[ion]" that the government's conduct violated substantive due process and only alleged that the conduct shocks the conscience (citing *Williams*, 544 F.3d at 690)).

## C.

Because we find Michigan res judicata bars Kircher from litigating the claims in his second amended complaint in federal court, we need to not address Barnes's twelfth-hour and unsupported grasp at immunity.

## IV.

We recognize that the state proceedings ended with Kircher losing three of his properties. And—in a vacuum—that consequence seems devastating. But state courts found Defendants had abundant reason to begin and continue those proceedings. Kircher continually disregarded Ypsilanti's Fire Prevention Code and court orders despite Defendants' attempts to work with him towards a mutual solution as early as 1996. And while Kircher may wish for a do-over, he won't find one here. So we AFFIRM.

---

*Supra*, at 6. Kircher *still* did not pay. Instead, he appealed and received further evidentiary hearings on remand.

But *still* he persistently refused to pay. So Defendants sought to foreclose on the judicial liens to recover their costs. *Supra*, at 8–9. And the state courts ruled in Defendants favor only after holding foreclosure proceedings. Kircher then received hearings again before the state appeals court and again before the circuit court on remand. *Supra*, at 9–14.

Thus, the record shows that Kircher received process at every turn of the state proceedings. So it seems unlikely that Kircher could successfully allege Defendants violated his procedural due process rights.